# In re Interest of J.S., A.C., and C.S., Children Under 18 Years of Age.
## State of Nebraska, Appellee, v. P.L., Appellant.
### 417 N.W.2d 147

Filed December 24, 1987.　No. 87-037.

252

Thomas L. Kovanda of Anderson, Vipperman, Hinman, Hall, Kovanda & Kovanda, for appellant.

Jerom E. Janulewicz, Deputy Hall County Attorney, and Patrick Brock of Cunningham, Blackburn, Livingston, Francis, Cote, Brock, and Cunningham, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, and SHANAHAN, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

P.L., mother of children involved in these proceedings (J.S., A.C., and C.S.), appeals from an order of the county court for Hall County, sitting as a juvenile court, which, pursuant to Neb. Rev. Stat. § 43-292(6) (Reissue 1984), terminated P.L.'s parental rights on account of her failure to correct conditions which led to the adjudication that P.L.'s children were juveniles within Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 1986). We reverse and remand with directions.

## ADJUDICATION AND THE PLAN

In its petition filed on January 17, 1985, the State alleged that P.L.'s children, J.S. (a daughter born on February 25, 1974), A.C. (a son born on October 17, 1981), and C.S. (a son born on November 7, 1983), were juveniles under § 43-247(3)(a), because those children lacked proper parental care by reason of the fault or habits of their parent. On the same day that the State filed its adjudication petition, the court entered an order placing temporary custody of the children in the Nebraska Department of Social Services ("Social Services"). Before the adjudication hearing, P.L. entered into an agreement with Social Services to follow certain child-care guidelines suggested by that department. On February 4, in the juvenile court, P.L. appeared with counsel and denied the allegations in the State's petition.

On March 4, a Social Services caseworker, who held a position entitled "child protective service worker II" and whose first contact with P.L. was in 1983, removed the children from P.L., who had custody according to an agreement with Social Services, after the caseworker received an unconfirmed report that P.L.'s daughter had been sexually assaulted by an adult babysitter's friend while P.L. was away for an evening. According to the caseworker, who was an employee of Social Services since 1980, removal of the children was also necessitated by information that P.L. might take her children to Kansas, although neither P.L. nor her children were required to remain in Nebraska as the result of an order or lawful directive from a legally empowered authority. After their removal from P.L., the children were placed in foster care by Social Services, pending further action by the juvenile court.

At the adjudication hearing on April 4, P.L., accompanied by her court-appointed attorney, withdrew her previous denial of the State's petition and admitted the petition's allegations concerning her children. The juvenile court then determined that it had jurisdiction by virtue of § 43-247(3)(a), which, in part, provides juvenile court jurisdiction regarding "Any juvenile . . . who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian . . . ." As a result of a dispositional hearing, the court placed legal and physical custody of the children with Social Services, subject to P.L.'s visitation at the department's discretion, and also ordered a plan for rehabilitation of P.L., which included counseling specified by Social Services, attendance at parenting classes identified and required by Social Services, and a job workshop program established by Social Services. On April 25, P.L. and Social Services' caseworker signed a rehabilitation agreement incorporating the provisions ordered by the court. As directed in the court's initial plan for rehabilitation, P.L. obtained counseling from family therapists. At a review hearing on October 10, the court renewed its order regarding custody of P.L.'s children and further ordered that P.L. and her adult male companion comply with the provisions specified in the April 25 rehabilitation agreement between P.L. and Social Services.

In chambers on April 16, 1986, the juvenile court conducted

a "review conference" which, among others, was attended by P.L.'s court-appointed attorney and the caseworker assigned to P.L. The record does not contain evidence which may have been presented at that review conference concerning alteration of the existing rehabilitation plan ordered in April 1985. Nevertheless, on April 16, 1986, the court continued child custody in Social Services, and then ordered that P.L. enter into a more detailed agreement with Social Services, specifically requiring that P.L.: (1) attend and complete Social Services' "parenting classes"; (2) participate in counseling or therapy directed by Social Services; (3) attend a job workshop, with proof of attendance; (4) participate in educational programs established for her son, C.S., and offered by the Grand Island public school system; (5) regularly visit her children, in conformity with arrangements by Social Services; (6) at the least, weekly attend a meeting of Alcoholics Anonymous; and (7) establish an independent residence, unless her husband, whom P.L. married after the rehabilitative agreement of April 25, 1985, entered into an agreement which would supplement the agreement to be signed by P.L. and Social Services. By reference, the order of April 16 incorporated the agreement to be signed by P.L. and Social Services, which further obligated P.L. to (1) maintain a suitable residence; (2) deliver monthly rent receipts to the caseworker; (3) attend her daughter's special activities as requested by the caseworker; (4) provide responsible, adult babysitters for P.L.'s 5-month-old daughter, J.D.L., who was not involved in the proceedings before the juvenile court; (5) refrain from leaving the children with "anyone" during any period of visitation; (6) prevent the children from riding a motorcycle; (7) abstain from entering, or being near, bars or lounges while she was in the company of her children; (8) report to the caseworker concerning any loans to P.L.; (9) inform the babysitter of P.L.'s whereabouts and the anticipated time of return home, when J.D.L. (not involved in these proceedings) was left with a babysitter; and (10) truthfully and fully report changes of circumstances. On April 17, P.L. signed the rehabilitative agreement submitted by Social Services which had been incorporated into the court's order of April 16. Therefore, the rehabilitative plan for P.L. included 17 provisions.

## STANDARD OF REVIEW

In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires the Supreme Court to reach a conclusion independent of the findings of the trial court, but, where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another.

*In re Interest of T.C.*, 226 Neb. 116, 117, 409 N.W.2d 607, 609 (1987).

## TERMINATION PROCEEDINGS

In its motion filed on August 8, 1986, the State sought termination of P.L.'s parental rights and alleged that P.L. had persisted in neglect of her children, refused to provide parental care and protection for the children, and was unfit as a parent on account of her "habitual use of intoxicating liquor which conduct is seriously detrimental to the health, morals or well being of the juveniles." Consequently, the State's action to terminate P.L.'s parental rights is based on § 43-292, which provides in part:

The court may terminate all parental rights between the parents [and a] juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:

. . . .

(2) The parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection;

. . . .

(4) The parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile;

. . . .

(6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247,

reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination.

*Background.* P.L. was married before the juvenile court ordered the rehabilitative plan in question and was still married at the date of the termination hearing. That marriage accounts for the presence of P.L.'s daughter J.D.L., but does not explain J.D.L.'s inclusion in the rehabilitation plan inasmuch as J.D.L. was not even born at the time of the adjudication in April 1985. Therefore, at the time the juvenile court ordered the rehabilitative plan in April 1986, P.L. was 31 years old, married, and an unemployed waitress or barmaid with a GED. When the termination hearing was held, and for purposes in this appeal, the ages of P.L.'s children were: J.S.—12 years; A.C.—5 years; and C.S.—3 years. At the termination hearing held on November 24 and December 16, 1986, evidence established that P.L. and her husband resided in a well-kept and suitable home with J.D.L., whom the caseworker always found to be the recipient of adequate care. P.L. regularly visited her children, whom she took on field trips, picnics, and shopping trips. The three children were moved from one foster home to another because some placements in foster homes did not "work out," but such moves were not attributable to the character, condition, or personality of P.L.'s children. Social Services removed the children from one foster home after P.L. reported that one of the foster parents had physically abused C.S. At times P.L.'s children were separated from one another during their stays in various foster homes. The juvenile court found that P.L. had complied with several of the provisions in the judicially ordered plan for rehabilitation, such as P.L.'s maintenance of a suitable home, regular exercise of visitation, and prevention of motorcycle riding by the children. Therefore, our opinion will discuss only those provisions which the juvenile court found to be completely unfulfilled as bases for terminating parental rights, and the evidential question raised by P.L.

*Documentary Evidence Questioned.* At the termination hearing, the State offered a Social Services written report concerning P.L. The report appears to have been admitted into

evidence at the adjudication hearing. That report pertained to the period from 1974 to 1985 and documented departmental contacts with P.L. through unidentified personnel of Social Services during that period, including P.L.'s noncompliance with a plan departmentally dictated by Social Services before the adjudication. P.L. objected (hearsay) to that report as evidence. Although the court did not admit that report as documentary evidence, the court considered the contents of the report, or, as expressed by the court:

> It's the Court's viewpoint . . . that the exhibit having already been received and having been a basis of the original petition and the original adjudication, need not be received at this time but *must be considered by the Court as a basis for determination with regard to the motion.* That is, the Court, in each instance, would sustain the objections for today's hearing *but must consider all of the material as basis for the motion.*

(Emphasis supplied.)

*Parenting Classes.* The parenting classes available to P.L. and which apparently would have satisfied the "parenting classes" provision in the rehabilitative plan lasted for an hour on 1 day of each week over a 4-month period. These classes, sponsored by Social Services, were conducted on a "group basis." As one instructor characterized those classes:

> We talk about child development. What your children should do [developmentally] at what age.
>
> . . . .
>
> . . . And, then we go to discipline because you have to know your child to be able to discipline them. And, then we do negative discipline techniques, you know, what can happen if you use this technique and then positive discipline techniques.

An objective of the course was establishment of "social contact" between parent and child. Although the parenting classes included items such as sex education and self-esteem, the classes did not provide instruction in elemental child care, for example, bathing and feeding children, or information about budget management for a family. Apparently, parenting classes commenced shortly after P.L. signed the rehabilitative plan.

P.L. did not attend those parenting classes, which were not reoffered until September 1986. J.S., the oldest daughter, testified that P.L. would spank her "once in a while . . . [o]n the behind . . . when I got in trouble" and concluded by testifying that she loved P.L. and wanted to go home with her.

*Job Support Workshop.* According to a representative of Social Services, the "job workshop" program exists to help the unemployed "toward eventual self-supporting full time employment." Early in 1986, before the rehabilitative plan, P.L. had contacted Social Services personnel about the workshop program, which was carried on over a 2-week period. When P.L. did not enroll, Social Services later attempted to notify P.L. by mail concerning availability of the program, but that notice was sent to the wrong address. Instructors in the job workshop worked with attendants at the classes in areas of "self-esteem, appearance, [and ways to] show liking skills," and techniques for a successful job interview, including eye contact and shaking hands. Although she did not attend the Social Services workshop, P.L. did contact the vocational rehabilitation department of the State of Nebraska, which provided a program substantially similar to the workshop offered by Social Services. P.L. was evaluated by the vocational rehabilitation department, which, at the time of the termination hearing, had invited P.L.'s return for further evaluation regarding a program for prospective employment.

*Rent Receipts.* P.L. delivered rent receipts to her caseworker for May and June of 1986, but produced no other rent receipts. However, P.L. actually paid the rent for July and succeeding months before the hearing on termination. Nothing indicated that payment of rent would be a problem for P.L. and her husband.

*Attendance at Classes for C.S.* An instructor in special education classes, which were offered through the Grand Island public school system, testified that C.S., the 3-year-old son, was experiencing a "delay in language skills." By attendance at speech therapy classes, a parent might learn some exercises to be adapted for a child's daily routine and thereby assist in anticipated amelioration of slowness in a child's speech. Those classes were offered twice a month in April and May 1986. P.L.

did not attend the April-May classes. School recessed at the end of May for the summer months, but therapy classes were scheduled to recommence in the fall of 1986. Therefore, before the State filed its motion for termination of parental rights, only four, or fewer, speech therapy classes had taken place.

*Babysitting during Visitation.* The caseworker assigned to P.L. and her children testified about the usual babysitting situation when P.L. exercised her visitation right by having the children in her home. When the three children were visiting, P.L.'s 12-year-old, seventh-grade daughter babysat her two brothers while P.L. would leave temporarily, for instance, to run errands. During such babysitting episodes, no harm came to any of P.L.'s children. According to the caseworker, the 12-year-old daughter (J.S.) was "not a very mature 12 year old" and "has become very frustrated and upset when having to control or deal with two active little boys." The caseworker concluded that J.S. was "not capable of dealing with active children." When counsel asked the caseworker: "But, you just don't think it's appropriate for [J.S.] to look after the younger kids?" the caseworker responded: "Absolutely."

*Entering Bars and Lounges.* Because P.L. did not have a telephone in her residence, she went to a nearby bar, owned by her relatives, to use the phone. The caseworker was aware that there was a phone in the bar because she had placed calls to that phone several times. When the children accompanied P.L. to their relatives' bar, they visited with their cousins. On such visits, P.L. never drank any alcohol.

*Meeting of Alcoholics Anonymous.* P.L. never attended any meeting of Alcoholics Anonymous, notwithstanding the requirement in the rehabilitative plan. The caseworker never saw P.L. take a drink of alcohol, detected no odor of alcohol on P.L., and saw no alcohol in P.L.'s home when the caseworker inspected the residence. P.L. has never been evaluated for alcoholism or diagnosed as an alcoholic. There was and is no professional recommendation that P.L. undergo any course of treatment for alcoholism or take action for an alcohol-related problem. According to the caseworker, P.L. had some unidentified alcohol problem in the past, "[t]hat was like 1977, so it was a long time back." The caseworker felt that AA

meetings "would be a good way for [P.L.] to understand alcohol better and it would help her generally in her understanding." P.L. told the caseworker that P.L. was not experiencing an alcohol problem and saw no reason to attend the AA meetings.

*Findings and Judgment of Juvenile Court.* As the result of the termination hearing, the court determined that evidence was insufficient to prove the State's allegation based on § 43-292(4) (parental unfitness due to habitual use of intoxicating liquor), but did not determine whether P.L.'s conduct came within the provisions of § 43-292(2) (persistent neglect and refusal to provide care or protection). However, among its findings the court concluded:

> The Court further finds that the state has proven by clear and convincing evidence that the natural mother has total failure of compliance with regard to parenting classes; job support workshop; monthly receipts of rent; attendance at [C.S.'s] classes or any training for him; leaving the children with other persons during visitation; going to bars and lounges while the children were with her and her failure to comply with the requirement to attend [Alcoholics] Anonymous.

Finally, the court found that "reasonable efforts under the direction of this Court over a period of 18 months have failed totally to correct the conditions leading to adjudication." The court then terminated P.L.'s parental rights regarding her children.

## ASSIGNMENTS OF ERROR

In her assignments of error, P.L. contends that the juvenile court erred in (1) failing to apply the "customary rules of evidence" at a termination hearing when the court received or considered Social Services' written report containing hearsay; (2) determining that the State had clearly and convincingly proved P.L.'s failure to comply with the rehabilitative plan designed to correct the conditions leading to the adjudication under § 43-247(3)(a); and (3) finding that, in the best interests of the children, termination of P.L.'s parental rights was the only reasonable alternative in view of noncompliance with the rehabilitative plan.

## NEBRASKA EVIDENCE RULES AND THE JUVENILE CODE

Regarding the use of Social Services' written report as evidence, P.L. argues that the report, replete with hearsay, had no place as evidence at the dispositional hearing because the "customary rules of evidence" preclude such documents as evidence.

Neb. Rev. Stat. § 43-2,128 (Cum. Supp. 1986) reminds us that the Nebraska Juvenile Code "shall be liberally construed to the end that its purpose may be carried out . . . ." Consequently, in *In re Interest of L.D. et al.*, 224 Neb. 249, 257, 398 N.W.2d 91, 97 (1986), we stated: "[T]he Nebraska Juvenile Code must be liberally construed to accomplish its purposes serving the best interests of juveniles within the act."

As stated in Neb. Evid. R. 1101(1) (Neb. Rev. Stat. § 27-1101(1) (Reissue 1985)) concerning applicability of the Nebraska Evidence Rules in certain courts, "These rules apply to . . . juvenile courts."

However, the Nebraska Juvenile Code contains explicit standards pertaining to the adduction of evidence at adjudication and dispositional hearings. The standard for permissible evidence at an adjudication hearing is stated in Neb. Rev. Stat. § 43-279(1) (Cum. Supp. 1986), as a part of the Nebraska Juvenile Code, which provides that admissibility of evidence shall be governed by "the customary rules of evidence in use in trials without a jury." The Nebraska Juvenile Code also provides: "Strict rules of evidence shall not be applied at any dispositional hearing." Neb. Rev. Stat. § 43-283 (Reissue 1984). Although expressed in loose legislative language, the "rules of evidence" mentioned in §§ 43-279(1) and 43-283 are the Nebraska Evidence Rules, that is, Neb. Evid. R. 101 to 1103 (Neb. Rev. Stat. §§ 27-101 to 27-1103 (Reissue 1985)). We note that, since adoption of the Nebraska Evidence Rules in 1975, this court has held that the Nebraska Evidence Rules control adduction of evidence at an adjudication hearing under the Nebraska Juvenile Code. See, *In re Interest of L.D. et al., supra; In re Interest of S.S.L.*, 219 Neb. 911, 367 N.W.2d 710 (1985); *In re Interest of Hollenbeck*, 212 Neb. 253, 322 N.W.2d 635 (1982). Regarding adduction of evidence at a dispositional

hearing, we have consistently held that the Nebraska Evidence Rules do not apply at a dispositional hearing, including an action to terminate parental rights, under the Nebraska Juvenile Code. See, *In re Interest of J.K.B. and C.R.B.*, 226 Neb. 701, 414 N.W.2d 266 (1987); *State v. Duran*, 204 Neb. 546, 283 N.W.2d 382 (1979); *State v. Bailey*, 198 Neb. 604, 254 N.W.2d 404 (1977).

The reason that the Nebraska Evidence Rules do not apply at a dispositional hearing, including a hearing to terminate parental rights under the Nebraska Juvenile Code, becomes readily apparent.

In *State v. Duran, supra*, this court commented concerning the distinction between an adjudication and a dispositional hearing:

> The issue in a disposition hearing where a child has been found to be neglected or dependent is not the adjudicated offense with which the children are involved, but rather a broader concern of overall conduct of the children and their parents and what ought to be done to correct the situation in the best interests of the children. . . . [T]he court must be concerned with the effect which the actions of a parent may create on the impressionable minds of young children.

204 Neb. at 554, 283 N.W.2d at 387.

Thus, once there has been the adjudication that a child is a juvenile within the meaning of the act, the foremost purpose or objective of the Nebraska Juvenile Code is promotion and protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parent(s) where continuation of such parental relationship is proper under the law. To accomplish such goal and fashion a dispositional remedy beneficial to the juvenile, a judge should have access to the best available evidence which is relevant, reliable, and trustworthy concerning a correct disposition for the juvenile. See, *State v. Bailey, supra; In re Melissa M.*, 127 N.H. 710, 506 A.2d 324 (1986); *Matter of C.J.H.*, 371 N.W.2d 345 (S.D. 1985); *In re Hinson*, 135 Mich. App. 472, 354 N.W.2d 794 (1984).

Frequently, parental conduct may be the cause, or a

contributing factor, in the adjudication that a child is a juvenile within the Nebraska Juvenile Code. Quite obviously, the best interests of a juvenile cannot require termination of the juvenile's parent(s), but a juvenile's best interests may require legal extinguishment or judicial termination of the child-parent relationship which caused or contributed to the adjudication under the Nebraska Juvenile Code. Therefore, under certain conditions specified in § 43-292, termination of parental rights may be an appropriate disposition under the Nebraska Juvenile Code. See, *In re Interest of J.K.B. and C.R.B., supra; In re Interest of Hollenbeck, supra; State v. Duran, supra.*

In view of the purpose or objective of a dispositional hearing, including a hearing to terminate parental rights under the Nebraska Juvenile Code, and in the light of our previous decisions in which we have held that the Nebraska Evidence Rules do not apply at a dispositional hearing pursuant to the Nebraska Juvenile Code, we expressly disapprove and reject the language found in *In re Interest of R.A.*, 226 Neb. 160, 166, 410 N.W.2d 110, 115 (1987): "Termination proceedings are subject to the customary rules of evidence applied in nonjury cases. Neb. Rev. Stat. § 43-279(1) (Reissue 1984)."

## FUNDAMENTALLY FAIR PROCEDURES

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

. . . .

. . . When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it.

*Santosky v. Kramer*, 455 U.S. 745, 753-54, 759, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). See, also, *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985).

In *In re Interest of J.K.B. and C.R.B.*, 226 Neb. 701, 704, 414 N.W.2d 266, 268 (1987), involving hearsay evidence and a fundamentally fair procedure concerning termination of parental rights, this court stated:

> While the rules of evidence do not apply at a dispositional hearing, Neb. Rev. Stat. § 43-283 (Reissue 1984), a proceeding to terminate parental rights must employ fundamentally fair procedures satisfying the requirements of due process, *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) . . . .

Therefore, while the Nebraska Evidence Rules, §§ 27-101 to 27-1103, are not applicable in a dispositional hearing, including a hearing to terminate parental rights, the requirements of due process control a proceeding to terminate parental rights and the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. See, Neb. Const. art. I, § 3; U.S. Const. amend. XIV.

## IMPROPER DOCUMENTARY EVIDENCE

In the present case, Social Services' report was offered to prove the truth of the matters asserted in the reports, namely, a factual basis for the conclusion that P.L. had willfully failed to comply with the rehabilitative plan. Therefore, such reports constitute hearsay. See Neb. Evid. R. 801 (definition of hearsay) (§ 27-801). Under the circumstances, the hearsay report effectively eliminated P.L.'s right to cross-examination regarding the contents of the departmental written report, which included prejudicial information embodied in entries by unidentified persons and which covered events outside the personal knowledge of any witness at the termination hearing. In proceedings to terminate parental rights under the Nebraska Juvenile Code, a parent has the due process right to cross-examine an adverse witness. *In re Interest of R.A., supra; In re Interest of J.K.B. and C.R.B., supra.* Without the test of cross-examination, the hearsay report was unreliable evidence

for termination of parental rights. Therefore, the juvenile court committed error in considering the Social Services report.

## PROOF BEYOND IMPERMISSIBLE OR IMPROPER EVIDENCE

The trial court's consideration of improper evidence does not, by itself, require reversal of a judgment terminating parental rights under the Nebraska Juvenile Code. Because factual questions concerning a judgment or order terminating parental rights are tried by the Supreme Court de novo on the record, impermissible or improper evidence is not considered by the Supreme Court. See, *In re Interest of J.K.B. and C.R.B., supra; In re Interest of R.A.*, 226 Neb. 160, 410 N.W.2d 110 (1987); *In re Interest of C.G.C.S.*, 225 Neb. 605, 407 N.W.2d 196 (1987). In an appeal from a judgment or order terminating parental rights, the Supreme Court, in a trial de novo on the record and disregarding impermissible or improper evidence, determines whether there is clear and convincing evidence to justify termination of parental rights under the Nebraska Juvenile Code. See *In re Interest of J.K.B. and C.R.B., supra.* Cf. *Santosky v. Kramer, supra* ("clear and convincing evidence" is the correct standard applicable for proof sufficient to terminate parental rights). "[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." *Castellano v. Bitkower*, 216 Neb. 806, 812, 346 N.W.2d 249, 253 (1984).

"As part of its powers, the juvenile court, in its discretion, may prescribe a reasonable plan for parental rehabilitation to correct the conditions underlying the adjudication that a child is a juvenile within the Nebraska Juvenile Code." *In re Interest of T.C.*, 226 Neb. 116, 121, 409 N.W.2d 607, 611 (1987). See, also, § 43-292 (termination of parental rights; failure to correct conditions leading to adjudication). However, when a parent fails to make reasonable efforts to comply with a court-ordered rehabilitative plan, the parent's failure presents an independent reason justifying termination of parental rights. *In re Interest of J.W.*, 224 Neb. 897, 402 N.W.2d 671 (1987); *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985). As we expressed in *In re Interest of W.*, 217 Neb. 325, 330, 348

N.W.2d 861, 865 (1984): "When parents cannot rehabilitate themselves within a reasonable time, the best interests of a child require that a final disposition be made without delay." Also, "when a rehabilitation plan is implemented, the plan must be reasonable and conducted under the direction of the juvenile court before failure to comply with the plan can be an independent reason for termination." *In re Interest of K.L.N. and M.J.N.*, 225 Neb. 595, 603, 407 N.W.2d 189, 195 (1987).

> In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code, Neb. Rev. Stat. §§ 43-245 to 43-2,129 (Cum. Supp. 1982 & Reissue 1984), termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence.

*In re Interest of T.C., supra* at 117, 409 N.W.2d at 609. A juvenile's best interests are the primary considerations in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code. See, *In re Interest of K.L.N. and M.J.N., supra; In re Interest of J.W., supra*.

The unequivocal language of § 43-292 imposes two requirements before parental rights may be terminated. First, requisite evidence must establish existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if a circumstance designated in subsections (1) to (6) is evidentially established, there must be the additional showing that termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. The standard of proof for each of the two preceding requirements prescribed by § 43-292 is evidence which is "clear and convincing."

Therefore, regarding parental noncompliance with a court-ordered rehabilitative plan, under § 43-292(6) as a ground for termination of parental rights, the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child.

Materiality of a provision in a court-ordered rehabilitative plan is determined by a cause-and-effect relationship: Does a provision in the plan tend to correct, eliminate, or ameliorate the situation or condition on which the adjudication has been obtained under the Nebraska Juvenile Code? An affirmative answer to the preceding question provides the materiality necessary in a rehabilitative plan for a parent involved in proceedings within a juvenile court's jurisdiction. Otherwise, a court-ordered plan, ostensibly rehabilitative of the conditions leading to an adjudication under the Nebraska Juvenile Code, is nothing more than a plan for the sake of a plan, devoid of corrective and remedial measures. Similar to other areas of law, reasonableness of a rehabilitative plan for a parent depends on the circumstances in a particular case and, therefore, is examined on a case-by-case basis.

An illustration of materiality is *In re Interest of T.C.*, 226 Neb. 116, 409 N.W.2d 607 (1987), in which medical evidence showed that immediate availability of cardiopulmonary resuscitation was necessary on account of a child's precarious physical condition. When the child's mother did not comply with the court's plan requiring the mother's receipt of instruction in CPR, the mother's noncompliance, on clear and convincing evidence, was a basis for termination of parental rights, as authorized by § 43-292(6). This is not to say that materiality exists only when there is a life-threatening situation as the consequence of parental noncompliance with a rehabilitative plan. Materiality regarding a rehabilitative plan does exist, however, when a parent's noncompliance results in a continued condition which was the basis for the adjudication and which is deleterious to a child expected to benefit from parental compliance with the rehabilitative plan.

As the result of our de novo review of the record and trial anew concerning factual questions, our findings require reversal of the judgment or order of the juvenile court. Our decision is necessarily based on the evidence, or lack of evidence, in the record brought from the juvenile court.

Regarding parenting classes required by the rehabilitative plan, the courses apparently contained a great deal of theory but nominal practicality regarding P.L.'s relationship with her

children. According to the record, the parenting classes may provide general knowledge which some day will be significant to P.L. in raising her children. True, P.L. did not attend the parenting classes. However, contained in the juvenile court's decision, either explicitly or implicitly as well as factually substantiated, are the conclusions that P.L. has satisfactorily complied with the rehabilitative plan's requirement pertaining to a suitable home, prevention of motorcycle riding, visitation of the children, counseling, participation in the older daughter's activities, and babysitters for J.D.L., the daughter not involved in the proceedings under review. Why the rehabilitative plan contains a provision directed toward a child who is not under the juvenile court's jurisdiction remains a mystery. Nevertheless, P.L. satisfactorily complied with many items which have a direct and immediate bearing on "parenting" or raising her children insofar as the situation existed under custodial constraints. As we view the record, there is a relationship and familial bond between P.L. and her children which probably comes from intuitive maternal knowledge irrespective of some classroom instruction on parenting.

Given P.L.'s work history, the job support workshop sponsored by Social Services may have some remedial value, but we cannot disregard P.L.'s contact with the vocational rehabilitation department of the State of Nebraska. At trial, the Social Services caseworker conceded that the programs of the two departments or agencies are very similar. Whatever may be the departmental interplay, we find that P.L. has made a bona fide effort to correct the condition of unemployment, regardless of the particular mandarin method specified in the rehabilitative plan.

The requirement of rent receipts deserves little comment. Suffice it to say, the record conclusively establishes that P.L. paid her rent for the period under examination relative to the rehabilitative plan. We do not recognize the absence of paperwork in the form of rent receipts as a basis to extinguish parental rights, which would be a triumph of form over substance, when evidence has established the very fact to be reflected by the missing documentation.

The speech therapy classes for C.S. are appropriate under

the circumstances, and P.L. should have obtained assistance by professional instruction concerning C.S.'s difficulty in speech. As far as their bearing on the disposition in the present case, the speech therapy classes were offered twice a month in April and May of 1986. The rehabilitative plan was ordered in mid-April 1986. Assuming that P.L. was given immediate information about the availability of speech therapy classes, four such classes, at the most, would have transpired before suspension of the therapy classes for summer recess. The State's motion for termination was filed in August. Such hasty action unfavorably reflects on the otherwise considered judgment required of the State seeking the serious dispositional consequence of parental rights termination. Whether plaintiff could have, or would have, successfully attended speech therapy classes is undisclosed or inconclusive in the record.

The babysitting provision, namely, that P.L. refrain from leaving the children with "anyone" during P.L.'s visitation is a troublesome and ill-advised provision apparently submitted by Social Services and summarily incorporated into the court-ordered plan for rehabilitation. That babysitting provision effectively precluded P.L.'s temporary absence for any reasonable purpose, such as a trip to the store to buy food for her family. If for some good reason, or even an absolute necessity, P.L. were required to temporarily leave her children during visitation, the provision in question dictates that P.L. shall leave the children by themselves, unattended by a babysitter. At that point, P.L. runs the risk of an administrative assault in the form of the allegation that P.L., by her literal obedience to the babysitting provision, is not providing suitable care or protection for her unattended children. Regarding the caseworker's comment that P.L.'s 12-year-old daughter (J.S.), as a babysitter, "has become very frustrated" in dealing with her brothers, who were "two active little boys," a similar feeling of frustration undoubtedly has been experienced by a multitude of parents while raising their children. The oldest daughter's babysitting has not been shown to be harmful or likely to continue any injurious condition which existed at the time of adjudication in the present proceedings. Under a literal or liberal construction, the babysitting provision compels the

conclusion that such provision is entirely impractical and, therefore, unreasonable. By contrast, the plan's provision that P.L., while accompanied by her children, is prohibited from entering bars and lounges may be reasonable, but the evidence fails to establish that P.L.'s presence in the bar was for anything but a reasonable purpose—use of a telephone which was unavailable at P.L.'s residence. The evidence before us leads to the conclusion that P.L.'s explanation for her presence in the bar is credible and negatives the State's assertion of willful noncompliance with the rehabilitative plan.

The requirement concerning the meetings of Alcoholics Anonymous fails to meet the test for materiality necessary in a rehabilitative plan. Most assuredly, we do not dispute that everyone should be fully informed about alcohol's nature and the abuse of alcohol. However, a requirement that a parent obtain such knowledge as a condition to retaining parental rights, when the parent has no alcohol-related problem, appears to be a somewhat draconian dictate. Under the circumstances, P.L.'s attendance at AA meetings was immaterial to the correction, elimination, or amelioration of a condition which resulted in the adjudication in this case and, therefore, was irrelevant in the termination proceedings. Further, the court's specific finding that the State had failed to prove existence of the specific condition described in § 43-292(4) (parental unfitness due to "habitual use of intoxicating liquor") only underscores the irrelevancy of the subject provision under the circumstances.

Consequently, we find that the State has failed to present clear and convincing evidence which shows P.L.'s willful noncompliance with the rehabilitative plan's provisions concerning a job workshop, rent receipts, babysitting, and entry into a bar or lounge while P.L. was accompanied by her children. Additionally, although the evidence sufficiently establishes that P.L. failed to attend parenting classes and the speech therapy classes for C.S. as well as the meetings of Alcoholics Anonymous, the State's evidence does not clearly and convincingly establish that such noncompliance necessitates termination of parental rights as the only alternative in the best interests of the children. Therefore, we

must reverse the judgment of the juvenile court.

## DISPOSITION ON REMAND

No doubt exists about the good intention of anyone involved in the formulation of the rehabilitative plan in these proceedings. Undoubtedly, everyone was trying to render assistance by a 17-point plan, but all that help can hurt when a rehabilitative plan becomes a fulcrum for termination of parental rights. The record does not contain evidence supporting the necessity for some provisions in the plan which precipitated this appeal. Deficiency of a factual basis for certain provisions of the rehabilitative plan is illustrated by the provisions concerning attendance at meetings of Alcoholics Anonymous and suitable babysitting for a child outside the jurisdiction of the juvenile court in this case.

We are frequently asked to review the reasonableness of a rehabilitative plan, as well as the very reason or objective underlying such plan. Without an adequate record reflecting the parental shortcomings or the parental conduct to be corrected, eliminated, or ameliorated through a rehabilitative plan, it is virtually impossible for this court to evaluate the efficacy of a rehabilitative plan and, more basic, to determine whether a plan is reasonable under particular circumstances. More crucial, however, is the fundamental fairness which must exist concerning proceedings to terminate parental rights, a subject of due process protection under the Constitutions, both state and federal. See, *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Fundamental fairness requires adduction of appropriate evidence as a factual foundation for a rehabilitative plan which eventually may be used as a ground or condition for termination of parental rights. If a court's order for a rehabilitative plan is not supported by the record, the plan may be some pro forma judicial inscription of activity which occurred outside the open courtroom or an unsubstantiated order which necessarily would be characterized as an arbitrary act. Either situation defies due process.

We hold, therefore, that, after an adjudication under § 43-247(3)(a) of the Nebraska Juvenile Code and before

entering an order containing a rehabilitative plan for a parent, a juvenile court shall inform the juvenile's parent that the court may order a rehabilitative plan and thereafter shall hold an evidential hearing to determine reasonable provisions material to the parental plan's rehabilitative objective of correcting, eliminating, or ameliorating the situation or condition on which the adjudication has been obtained. Because the evidential hearing for a rehabilitative plan is a dispositional hearing, the Nebraska Evidence Rules, §§ 27-101 to 27-1103, shall not apply at such hearing. The record of proceedings before a juvenile court shall contain the evidence presented at the dispositional hearing held for the purpose of the parental rehabilitative plan. The juvenile court's specific findings of facts supporting the provisions contained in the parental rehabilitative plan shall be stated in the record. The foregoing procedural rule, which we have enunciated today, is prospective only and shall apply to a juvenile court's order which is entered after the filing date of this opinion and contains a rehabilitative plan for a parent.

Therefore, regarding the proceedings now before us for review, we reverse the judgment and order of the juvenile court and remand this matter to the juvenile court for further proceedings. The juvenile court shall forthwith hold an evidential hearing. Based on the proper evidence adduced at that hearing, the juvenile court shall determine whether custody of the children shall be returned to P.L. and, if child custody is returned to P.L., whether Social Services' supervision of custody is warranted. If the juvenile court finds that a rehabilitative plan is necessary, the court shall proceed to determine and specify a realistic remedial plan, based on evidence presented at the hearing on remand, and in the light of current circumstances, to correct, eliminate, or ameliorate the conditions constituting, or contributing to, the basis for the adjudication. We believe that such disposition by remand is a reasonable alternative to the termination of parental rights, which is the "last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code." *In re Interest of T.C.*, 226 Neb. 116, 117, 409 N.W.2d 607, 609 (1987).

REVERSED AND REMANDED WITH DIRECTIONS.

GRANT, J., not participating.