IN RE INTEREST OF T.F.P., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE, V. L.P., APPELLANT.

468 N.W.2d 116

Filed April 19, 1991.   No. 90-643.

Charles D. Hahn for appellant.

Allen Fankhauser, of Kotouc, Fankhauser & Maschman, guardian ad litem.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

COLWELL, D.J., Retired.

This is an appeal from an order of the Nemaha County Court, sitting as a juvenile court, which, pursuant to Neb. Rev. Stat. § 43-292(6) (Reissue 1988), terminated the mother's parental rights to her son, T.F.P., who had been adjudged a juvenile within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988). The father's parental rights were terminated pursuant to Neb. Rev. Stat. § 43-292(1) (Reissue 1988); he does not appeal. We affirm.

This case arose from the long-term incarceration of the father at the Nebraska Penal Complex and the 9-month incarceration of the mother in the Richardson County, Nebraska, jail for writing bad checks. On March 4, 1986, the mother signed a voluntary placement of T.F.P. with the Nebraska Department of Social Services (DSS).

When DSS took T.F.P. into custody, the child, who was born on February 3, 1983, was 3 years old. He had head lice, was not toilet trained, and was developmentally delayed by about 1 year. The mother, T.F.P., and two of her older children were then living with a man who was not her husband and the man's son. It appeared the only support available from the man and his son was $70 a month received by the son for National Guard duty.

DSS was working with the mother because she had demonstrated a pattern of being unable to manage her funds and a lack of parenting skills.

A juvenile court petition was filed on March 25, 1986, alleging that T.F.P. was a juvenile as defined by § 43-247(3)(a) because he was homeless and abandoned by his parent; he lacked proper parental care by reason of the fault or habits of his parent; and his parent neglected or refused to provide proper subsistence, education, or other necessary care for his health, morals, or well-being. On May 6, 1986, T.F.P. was adjudicated a juvenile as alleged, based in part on admissions of the mother. Disposition was with DSS, and a plan for reunification was ordered.

Pursuant to statute requiring 6-month reviews, the case was reviewed on November 4, 1986, and the plan for reunification was offered and received without objection. The plan required the mother to do the following: (1) continue with counseling

and parenting instruction as needed; (2) obtain adequate permanent housing, with no other unmarried and/or unrelated persons living there, and maintain clean and sanitary conditions; (3) live within her income, which includes not writing bad checks; (4) see that the child receives appropriate medical and educational services; and (5) work with Christian Heritage. The plan was to begin when the mother was released from jail.

The next review was held May 5, 1987, and the mother had made substantial progress since her release from incarceration. T.F.P. was placed with his mother in her home, with custody remaining with DSS.

At the November 10, 1987, review hearing, the evidence showed the mother's progress had deteriorated since July 1987. Twenty-six bad checks had been written between October 13 and October 20, 1987, using checks from a bank in Johnson, Nebraska.

At the review hearing on April 12, 1988, it was shown that the mother was over $1,000 behind in her rent, she had been forging her landlord's signature on rent receipts, she had written more bad checks, and she had been living with a man who was not her husband. The mother was not taking T.F.P. to necessary appointments, and she was having difficulty in supporting and disciplining him. T.F.P. was placed with his foster family by DSS on that date.

The review hearing of November 8, 1988, showed that visitations with his mother had a disruptive effect on T.F.P., the mother's participation in counseling was superficial, and she continued to be dishonest with DSS workers regarding her finances. DSS indicated that if the mother was unable to meet the plan, the agency would request termination of her parental rights.

The next review hearing was May 2, 1989. Because of a misunderstanding on the part of her attorney, the mother was not present. No evidence was adduced; however, a notation was made that the mother was involved in a 31-check check-kiting scheme at a Humboldt, Nebraska, bank. The previous plan remained in effect.

At the review hearing on October 31, 1989, the evidence

showed that the mother was still writing bad checks. A complaint had been filed in Otoe County, Nebraska, against the mother for writing an insufficient-fund check, to which complaint she pled guilty and was sentenced to 30 days in jail on July 12, 1989. On April 12, 1989, a complaint had been filed in Nemaha County for issuing a bad check, a Class IV felony, to which complaint the mother pled guilty and was awaiting sentencing. At the time of the hearing, the mother was living with and helping support another man, who was married to someone else. The mother testified at this hearing that she understood the terms of the plan and that she had not done very well in her rehabilitation.

On February 22, 1990, a petition for termination of parental rights was filed, alleging that reasonable efforts under the direction of the court had failed to correct the conditions which led to the determination that T.F.P. was within the meaning of § 43-247(3)(a). A hearing was held on April 3 and June 12, 1990. The evidence was basically the same as that presented at past review hearings. There was evidence that plans were submitted by DSS at each review hearing in the form of reports and that the mother generally failed to comply with them.

Leslie Mamer, a therapist for the mother and T.F.P., testified that the mother's regular writing of bad checks was not an addictive behavior but, rather, a controllable choice for her. Mamer described a check pyramid scheme that the mother had used, involving numerous checks and several banks. According to Mamer, the prognosis for reform on the mother was guarded, and therapy would be long term. In her opinion, it was not in T.F.P.'s best interests to be returned to his mother.

The mother admitted that she understood the plans for reunification. She admitted that she had written possibly hundreds of bad checks since the inception of this case. She also testified that she was on 2 years' probation for the felony conviction in Nemaha County. She promised she would not write any more bad checks, but was not sure she would be able to keep that promise.

There was testimony that T.F.P.'s foster family is willing to adopt him.

The trial court found that the causes for T.F.P.'s juvenile

status under § 43-247(3)(a) were the mother's jail incarceration for writing bad checks and that she had failed to comply with the rehabilitative plan's provisions concerning living within her budget and not writing bad checks. It was also found that she failed other aspects of the plan as well. The trial court terminated the mother's parental rights because of the mother's failure to comply with the rehabilitative plan conditions and the clear evidence that T.F.P.'s best interests required such termination.

The mother assigns as error the trial court's findings and termination of her parental rights. She argues the failure of the State to comply with some statutory procedures; however, she does not assign the same as error. Errors argued but not assigned will not be considered on review by this court. *Federal Land Bank of Omaha v. Victor*, 232 Neb. 351, 440 N.W.2d 667 (1989).

This case is reviewed de novo to determine whether the evidence is clear and convincing that parental rights should be terminated. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). The Supreme Court is required to reach a conclusion independent of the findings of the trial court; however, where the evidence is in conflict, this court considers and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *Id.*

The problems necessitating the court's involvement in this case were that the mother was incarcerated for writing bad checks and that she was deficient in parenting, financial management, and homemaking skills. Budgeting and parenting skills, together with refraining from criminal activity, were always part of the reunification plans submitted at each review hearing.

The mother understood that she was not to write bad checks; however, she continued to do so. She was in jail again, for 30 days, and on probation for 2 years. Furthermore, she continued to have relationships with men who created an additional drain on her resources, and her parenting skills fell short of what was expected of her and what her son's needs required.

T.F.P. has been in foster care for more than half his life. He is entitled to and needs permanency and stability, which his mother does not provide. He needs a secure and permanent home. T.F.P. has a foster family that is ready to provide for his needs and such a home.

A juvenile's best interests are the primary considerations in deciding whether parental rights should be terminated. *In re Interest of J.S., A.C., and C.S., supra.* When a parent cannot rehabilitate herself within a reasonable period of time, the best interests of the child require that a final disposition be made without delay. *Id.*

The evidence is clear and convincing that the mother failed to correct the conditions which led to the court's involvement in this matter and that it is in T.F.P.'s best interests that the mother's parental rights be terminated.

The judgment is affirmed.

AFFIRMED.