IN RE INTEREST OF N.W. AND R.W., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE, V. T.J.W., APPELLANT.

472 N.W.2d 887

Filed July 12, 1991.   No. 90-685.

Steven M. Delaney, of Hascall, Jungers & Garvey, for appellant.

Ralph M. Anderson, Jr., Special Prosecutor, and Daniel A. Smith, guardian ad litem, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

The father has appealed the order of the county court for Burt County which terminated his parental rights to his minor children, N.W. and R.W.

The father assigns as error (1) the lack of jurisdiction of the trial court to terminate parental rights due to a failure to conduct a prior adjudication hearing, (2) the court's finding that the rehabilitation plan was reasonable, (3) the court's determination that the father willfully failed to comply with the rehabilitation plan, and (4) the court's decision that it was in the best interests of the minor children to terminate the father's parental rights.

A petition was filed by the county attorney in the county court for Burt County on September 30, 1986. The petition alleged that R.W., a girl born on March 13, 1981, and N.W., a girl born on January 26, 1984, children of the appellant, were living in the appellant's home together with their half brother,

R.Y., born September 28, 1971, and their half sister, C.Y., born September 3, 1976. The children's mother is deceased. R.Y. and C.Y. are not involved in these proceedings. The petition goes on to allege that C.Y. had complained she had been sexually abused by her stepfather, the appellant, and that the latter had been arrested and was incarcerated. As a result, the petition stated, the children were without proper support and were in need of necessary subsistence, education, and other care necessary for their health, morals, and well-being. An order seeking temporary custody in the Department of Social Services was sought and obtained. The record discloses no service of summons on the father.

A hearing was had on October 27, 1986, seeking a formal order of custody. At that hearing, only the county attorney and a representative of the Department of Social Services were present before the court. That hearing revealed that at the time of the filing of the petition there was no need to secure a custody order because the children's grandmother took over the care of the children. However, it was disclosed that the grandmother later felt that she could no longer handle the children, and therefore they were placed in foster care. An order granting temporary custody to the Department of Social Services was entered by the court.

The court appointed a guardian ad litem for the children on December 15, 1986, and an attorney for the father on February 23, 1987. A hearing, at which the father's attorney appeared, was held on April 13, 1987, on the father's application for temporary custody of the children. The father was denied custody and was ordered to have no contact with the children.

A July 13, 1987, hearing was had, with the father's attorney present, and the court ordered visitation of N.W. and R.W. with their paternal grandparents. An order appointing a replacement guardian ad litem was entered by the court on November 16, 1987. A copy of that order was served on the father at the Lincoln Correctional Center, and a copy was served on his attorney.

On November 23, 1987, a hearing was had on the application of the father for visitation. The order entered on that date is rather confusing. It grants permission for the paternal

grandmother to have a specific 2-day visit with the children. It provides that the father shall not be permitted to speak with either child by telephone while the children are in the custody of the grandmother and that "[a]pplicant's request for additional overnight visitations is hereby denied at this time." A similar order was entered on December 14, 1987, granting a specific 3-day visitation with the grandmother. The court again denied the father the right to speak to the children by telephone while they were in the custody of the grandmother.

On April 11, 1988, a review hearing was held at which the father was represented by his attorney. The motion of the State for a new rehabilitation plan and order was denied. Additional visitation was provided to the paternal grandparents. It was also ordered that in the event the father was released from incarceration prior to the next review hearing, he would not be permitted any visitation with the children.

According to an order dated October 24, 1988, the father had filed a petition for a writ of habeas corpus ad testificandum on October 21, 1988. No such petition appears in the record. The order indicated that the attorney for the father had testified as to the circumstances surrounding his withdrawal as attorney for the father. The order went on to recite that the father's petition for a writ was overruled as not having been timely filed and that when the father's court-appointed attorney withdrew, the father advised his former attorney that he had hired an attorney of his own choice. The court then found that "the credibility of the father was not an issue at this review hearing and that the decision to proceed pro se was the father's own choice." A copy of that order was ordered to be sent to the father. On August 14, 1989, the court appointed an attorney to represent the father. However, at a hearing at which the father was present held on that same day, the court found that the father informed the court that he desired to retain his own counsel.

The father appeared in court on September 18, 1989, in person and with his attorney, who was the same attorney appointed by the court. At the hearing conducted on that date, the father stated that he would accept the rehabilitation plan developed by the Department of Social Services. Later, on

February 26, 1990, the father, through his attorney, filed a motion to amend the rehabilitation plan. That motion alleged among other things that the plan required that he participate in a sex offenders' group, but that he was not allowed to participate, and he therefore requested that the plan be amended.

A motion for termination of the parental rights of the father was filed on February 26, 1990. On March 12, 1990, the father's motion to amend the rehabilitation plan was overruled and the hearing on the motion to terminate parental rights was set for March 19, 1990.

The court then conducted a hearing on April 9, 1990, to act on the State's motion "moving for an Order of Adjudication as to all four children involved in this matter Nunc Pro Tunc journalizing verbal orders entered April 11, 1988 by the County Court of Burt County, Nebraska, and appearing at such hearing [was the] father of the juveniles, with his attorney . . . ." The court granted the motion of the special prosecutor and further found:

> The Court took judicial notice of its file and its testimony in this matter and again found the children or childrens [sic] as defined in 43-247 (3)(a), based upon that I am quoting directly from page 9 of the document. (Exhibit 1) I still do not believe the October 27, 1986 was a [sic] adjudication, but April 11, 1988 was an adjudication.

The father's motion to dismiss for lack of jurisdiction was denied.

A hearing on the State's motion to terminate the parental rights of the father was held. By order dated June 27, 1990, the court found that the father was not allowed to enter the prescribed psychotherapy program because he would not admit to prior sexual problems, although he had pleaded guilty to sexual assault. The court further found that the father had willfully failed to comply in part with the reasonable provisions material to the court-ordered rehabilitation plan and that termination of parental rights of the father was in the best interests of the children. The parental rights were terminated.

Whatever deficiencies there were in acquiring personal jurisdiction over the father in the first instance because of

equivocal findings regarding adjudication were corrected by the voluntary acts of the father.

By the father's acceptance of the rehabilitation plan in open court on September 18, 1989, he submitted his person to the jurisdiction of the court, and by agreement he implicitly accepted the adjudication procedure of the court. Of even more significance, the father appeared in person at a hearing on April 9, 1990, and in response to the father's motion to dismiss for lack of jurisdiction absent an adjudication, the court, by order nunc pro tunc on April 23, 1990, declared that its adjudication occurred at the April 11, 1988, hearing. Although there may be some doubt that such action was properly a nunc pro tunc order, the fact remains that for the first time the court declared on the record that the children were adjudicated to be within the provisions of the Nebraska Juvenile Code. It was an order from which the father could have appealed. See *Interstate Printing Co. v. Department of Revenue*, 236 Neb. 110, 459 N.W.2d 519 (1990). He did not choose to do so and has waived any rights he might have in that regard. That disposes of the father's first assignment of error.

We must now examine the facts in light of the remaining assignments of error, which may be combined to state that the court erred in finding that the rehabilitation plan was reasonable, that the father willfully failed to comply with the plan, and that the best interests of the children required that the court terminate parental rights.

At the outset, we feel compelled to comment on the infirmities present in the procedure used in this case, or at least on the deficiency of the record covering such procedure. In the first place, there apparently was no service of summons on the father nor any type of appearance by him until well into the proceedings, other than by an attorney appointed for the father without notice to the latter. Also, it should not be necessary for a reviewing court to go to such lengths to find that an adjudication hearing has been held. Apparently, not all of the hearings held were on the record. Certain orders representing hearings, although dated when signed, did not show the date of the proceedings. Perhaps of more serious concern is the apparent lack of physical evidence of the court-ordered

rehabilitation plan.

Proceedings were instituted alleging the children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988), being without proper support and being in need of necessary subsistence, education, and other care necessary for their health, morals, and well-being. Emergency action was taken, presumably under the provisions of Neb. Rev. Stat. § 43-248 (Reissue 1988), because the mother was deceased and the father had been incarcerated for sexually abusing one of the other juvenile girls residing in the father's household. Section 43-248 permits an officer of the peace to take temporary custody of a juvenile without an order of the court "when such juvenile is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection . . . ."

There should appear in the record at the very least an affidavit or similar sworn statement by the officer substantiating this claim. The petition filed in the county court was subscribed and sworn before the county judge and would seem to meet this requirement.

Neb. Rev. Stat. § 43-250 (Cum. Supp. 1986) requires the officer who takes a juvenile into custody to make a full written report to the county attorney within 24 hours of taking temporary custody of the juvenile. To continue temporary custody in the Department of Social Services it is necessary to obtain an order from the appropriate court within 48 hours of obtaining temporary custody.

The order granting temporary custody of the juveniles in the Department of Social Services is one dated October 27, 1986. That order recites that the temporary custody was effective September 19, 1986. Thus, apparently, the 48-hour rule was not followed. Perhaps in explanation of that apparent failure to follow the statute is the information obtained at the October 27, 1986, hearing, in which it was suggested that the grandmother had taken custody of the children and the children were later turned over by the grandmother to the Department of Social Services.

The father's parental rights were terminated because he failed to make reasonable efforts to comply with the

court-ordered rehabilitation plan. Thus is raised the problem, What is and where is the plan?

A plan is first mentioned in the record of a proceeding held on June 25, 1990, which seems to be the hearing on the State's motion to terminate parental rights. The record does not show the presence of the father, but it does indicate that the father's attorney was present. A written order appears in the transcript, which was signed and filed on June 27, 1990, in which the parental rights were terminated, and which order indicates that the father was present with his attorney.

At that hearing Lori Aman, an employee of the Department of Social Services, testified that at a hearing held on September 18, 1989, "the rehabilitation plan was adopted." She stated that the father was present at that hearing and agreed that he would follow the plan. An order dated September 18, 1989, disclosed that "[the father] stated that he would accept the rehabilitation plan."

Aman was asked, "Do you have a copy of that plan in front of you?" to which she answered, "Yes, I do." Unfortunately that is as close as a reviewer of the record ever gets to the actual plan.

However, she did testify, without objection, as to the pertinent parts of the plan. First, "pursuant to evaluation of Sally Grosse in November of 1987, [the father] shall initiate, through the case worker, individual psychological testing, particularly evaluating for organic changes from chemical dependency. Such testing will indicate parental limits for progress and/or change."

According to Aman, the father was referred to Boys and Girls Home and Family Services in Sioux City, Iowa, represented by Aman as the best resource available in the father's geographic area. The father was evaluated by and responses were received from two different staff people in that organization.

A family therapist responded that the organization's treatment program is for individuals who admit they have sexually abused a child. That response went on to state that the father states, although he pleaded guilty to abusing his stepdaughter, he did not sexually abuse her. The conclusion was

reached that he was not an appropriate person for the treatment program because of that denial.

There was a report from another family therapist who repeated the same information, i.e., the father repeatedly denied sexually abusing his stepdaughter, and he was informed that because of that he could not be accepted into the program. Siouxland Mental Health Center was suggested as a "program for sexual offenders with a somewhat different focus." There is a letter in the file addressed to Judge F.A. Gossett and written by Aman, stating that she had begun the referral process to Siouxland Mental Health and, although she had not heard back from Siouxland Mental Health, she would advise the father when she did.

The second item on the rehabilitation plan, according to Aman, was the requirement that the father have a further chemical dependency evaluation done and that he participate in inpatient treatment for chemical dependency. The father did complete the chemical dependency evaluation, but inpatient treatment was not recommended, apparently by the evaluating agency. However, some educational classes were recommended, which the father did attend. According to the counselor, the evaluation was based on the responses made by the father in which he "did not indicate an ongoing diagnosis of abuse or dependence."

The third plan requirement was that the father begin involvement in Parents United, a group for parents in incestuous families. Aman stated that this requirement was not complied with, and she thought that the father never asked for any information about that service.

The fourth plan item required that the father begin individual psychotherapy upon release from incarceration, with particular focus on perpetration issues and parenting skills. This requirement tied in with the first plan requirement, and the father was not accepted in the program because of his refusal to admit responsibility for the sexual assault.

The fifth plan item required that the father initiate involvement in parenting classes, and Aman had no knowledge that that had been done.

The last requirement was that the father have no contact

either with the stepdaughter whom he assaulted or with any of the children, and Aman testified that the father had had no contact with any of the children.

Aman said that the father had never admitted the assault to her except that on one occasion he told her that there had been no penetration and therefore he should not have been charged.

The father had been evaluated while still incarcerated by a psychotherapist, Sally Grosse, M.S.N., R.N., C.S., in 1987. According to her, the father refused to participate in a sex offenders' group provided by the correctional center because of his denial of the sexual assault. In a December 16, 1987, letter to Aman, Grosse recommended psychological testing, with attention to evaluation of organic change, followed by inpatient alcohol treatment. She went on to state, "Following alcohol treatment, but prior to any involvement with the children I am recommending family therapy since at this time the children do not have a relationship with [their father]."

As far as the record discloses, the father has had no contact with his children since he was arrested and incarcerated in September 1986.

The record demonstrates that the father of these two children has made no effort whatsoever to become a part of his children's lives. He has been absent from the children during his incarceration for sexual assault of a minor stepdaughter. He has refused to accept, for purposes of therapy, the fact that he has any problem with sexual conduct with children—this in spite of the fact that he admitted by his plea of guilty that he did in fact sexually assault a minor stepchild.

The rehabilitation plan required that he submit himself to therapy to approach a status where he would no longer subject minor children, including his own, to sexual assault. Does a provision in the plan tend to correct, eliminate, or ameliorate the situation or condition on which the adjudication has been obtained under the Nebraska Juvenile Code? An affirmative answer to the preceding question provides the materiality necessary in a rehabilitative plan for a parent involved in proceedings within a juvenile court's jurisdiction. Materiality regarding a rehabilitative plan exists when a parent's noncompliance results in a continued condition which was the

basis for the adjudication and which is deleterious to a child expected to benefit from parental compliance with the rehabilitative plan. *In re Interest of J.S., A.C., and C.S.,* 227 Neb. 251, 417 N.W.2d 147 (1987).

In light of the father's guilty plea to the child sexual assault charge, it was not unreasonable for the rehabilitation plan to include the requirement of therapy which was conditioned on the father's admission of such a problem. The father acknowledged that he felt unable to control his stepchildren and that his family life had gotten out of control prior to the alleged sexual assault, as other adults were drinking, partying, and watching pornography at times when the children were present. Based on the evaluations and the recommendations, there is sufficient evidence that the rehabilitation plan was reasonable.

A juvenile's best interests are the primary considerations in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code. *In re Interest of A.A.Y., F.E.Y., and K.C.Y.,* 237 Neb. 414, 466 N.W.2d 93 (1991). A parent's natural right to the custody of his or her own child must yield when the two requirements of Neb. Rev. Stat. § 43-292 (Reissue 1988) have been met. First, there must be clear and convincing evidence of the existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if one of the conditions prescribed in subsections (1) to (6) has been evidentially established, there must be an additional showing by clear and convincing evidence that termination of parental rights is in a child's best interests. It is a combination of the best interests of the child and evidence of fault or neglect on the part of the parent that is required. *In re Interest of J.B. et al.,* 235 Neb. 530, 455 N.W.2d 817 (1990).

A parent afforded a program of rehabilitation must realize that the courts will examine a pattern of parental conduct in determining an appropriate disposition for the best interests of a child. *In re Interest of L.O. and B.O.,* 229 Neb. 889, 429 N.W.2d 388 (1988). A review of the rehabilitation plan in its entirety shows that the father not only failed to have the required therapy because of his failure to admit sexual assault of a child, but also failed to comply with other aspects of the plan. His pattern of parental conduct regarding the

rehabilitation plan fails to reflect a genuine effort at rehabilitation toward the end of reunification with his children. The best interests of the children will be served by termination of the parental rights.

The judgment of the trial court is correct and is affirmed.

AFFIRMED.