IN RE INTEREST OF J.H., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE, V. D.H., APPELLANT.

497 N.W.2d 346

Filed March 12, 1993.   No. S-92-095.

Eugene G. Schumacher, of Luckey, Sipple, Hansen, Emerson & Schumacher, for appellant.

Jeffrey S. Golden, Deputy Platte County Attorney, and Clark J. Grant, guardian ad litem, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Appellant, D.H., appeals the termination of her parental rights to her son, J.H., pursuant to Neb. Rev. Stat. § 43-292(6) (Reissue 1988).

The child who was born July 24, 1990, was placed in protective custody of the Department of Social Services (DSS) at 2 months of age, after being brought to the hospital by two teenagers who had been caring for him. Upon admission to the hospital, the child was 13 oz. below his birth weight, had severe diaper rash, and a gag reflex that only permitted him to ingest

small amounts of food at a time. The protective service worker found, although she gave no basis for her findings, that the child's 18-year-old mother had little or no awareness of the child's basic needs, showed no remorse, lacked the knowledge, skill, or motivation necessary in parenting to protect the child, and could not explain the child's condition.

The mother attended scheduled visits sporadically and on May 10, 1991, left the state of Nebraska for Texas for a period of roughly 3 months. Although the mother did phone DSS on her child's birthday, she had not attempted to initiate contact with him since the previous April and ultimately did not visit him until August 28, 1991—a period of 4½ months. She offered no explanation for her absence, although she asserts that a friend had represented to her that her parental rights had already been terminated, and thus, the mother saw little reason to continue directing efforts toward reunification with her son.

The State and the child's guardian ad litem (GAL) jointly filed a motion to terminate parental rights on November 15, 1991. After 5 days of hearing, the court entered an order terminating appellant's parental rights on January 14, 1992.

The mother alleges, in summary, that the county court, sitting as a juvenile court, erred in the following respects:

1. Overruled the motion to strike where the court had failed to hold an evidential hearing to determine reasonable provisions material to the case plan's rehabilitative objectives of correcting, eliminating, or ameliorating the situation or condition on which the adjudication had been obtained and had further failed to make specific findings of fact supporting the provisions contained in the case plan;

2. Overruled the mother's motion for declaratory judgment challenging the constitutionality of Neb. Rev. Stat. § 43-285(2) (Reissue 1988) to the extent that the court relied upon the statute for purposes of overruling the motion to strike;

3. Found clear and convincing evidence that the mother had failed to follow the court-ordered case plan to rehabilitate herself so that her son could be returned to her;

4. Failed to find that the provisions of the case plan were not material, reasonable, and necessary to correct, eliminate, and ameliorate the situation or condition on which the adjudication

had been obtained;

5. "Impermissibly" delegated its judicial responsibility by leaving the nature and frequency of the counseling to be administered through the rehabilitative plan to the discretion of DSS;

6. Found that clear and convincing evidence established that the mother substantially, continually, and repeatedly neglected her minor child;

7. Found clear and convincing evidence that the child's interests were best served by terminating the parental rights of his mother;

8. Allowed a caseworker to render an opinion that the mother's rights should be terminated and that it was in the juvenile's best interest that the mother's rights be terminated;

9. Granted the motion in limine filed by the State and GAL, prohibiting the mother from adducing testimony of Dr. Sanders, and denying the mother due process of law;

10. Denied the mother's motion to strike testimony of a Dr. Huebner after granting the State's motion in limine;

11. Admitted exhibits and testimony which consisted of hearsay and which deprived the mother of her right to confront and cross-examine; and

12. Sustained the State's objection which prevented the mother from adducing testimony as to whether the natural father's parental rights had been terminated.

An appellate court must decide a case involving termination of parental rights de novo on the record, in keeping with our holdings in *In re Interest of S.B.E. and D.E.*, 240 Neb. 748, 484 N.W.2d 97 (1992); *In re Interest of C.W., M.W., K.W., and J.W.*, 239 Neb. 817, 479 N.W.2d 105 (1992).

In an appeal from a judgment terminating parental rights, an appellate court tries factual questions de novo on the record, which requires an appellate court to reach a conclusion independent of the findings of the trial court, but, when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed witnesses and accepted one version of the facts rather than another. *In re Interest of M.P.*, 238 Neb. 857, 472 N.W.2d 432 (1991).

The primary consideration in determining whether to

terminate parental rights is the best interest of the child. When a parent is unwilling or unable to rehabilitate herself or himself within a reasonable period of time after the adjudication hearing, the best interests of the child usually require that a final disposition be made without delay. *In re L.J., M.J., and K.J.*, 238 Neb. 712, 472 N.W.2d 205 (1991). Furthermore, when a parent fails to make reasonable efforts to comply with a court-ordered rehabilitative plan, the parent's failure presents an independent reason justifying termination of parental rights. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

In the mother's first two assignments of error, she contests first the court's overruling of a motion to strike where the court had failed to hold an evidential hearing to determine reasonable provisions material to the case plan's rehabilitative objectives of correcting, eliminating, or ameliorating the situation or condition on which the adjudication had been obtained and had further failed to make specific findings of fact supporting the provisions contained in the case plan. Secondly, she complains that the court ought not to have overruled her motion for declaratory judgment challenging the constitutionality of § 43-285(2) to the extent that the court relied upon the statute for purposes of overruling the mother's motion to strike.

It is well settled in Nebraska law that after an adjudication under § 43-247(3)(a) of the Nebraska Juvenile Code and before entering an order containing a rehabilitative plan for a parent, a juvenile court shall inform the juvenile's parent that the court may order a rehabilitative plan. Thereafter, the court shall hold an evidential hearing to determine reasonable provisions material to the parental plan's rehabilitative objective of correcting, eliminating, or ameliorating the situation or condition on which the adjudication has been obtained. Because the evidential hearing for a rehabilitative plan is a dispositional hearing, the Nebraska Evidence Rules, Neb. Rev. Stat. §§ 27-101 to 27-1103 (Reissue 1989), shall not apply at such hearing. The record of proceedings before a juvenile court shall contain the evidence presented at the dispositional hearing held for the purpose of the parental rehabilitative plan. The juvenile court's specific findings of fact supporting the

provisions contained in the parental rehabilitative plan shall be stated in the record. *In re Interest of J.S., A.C., and C.S., supra.*

Regardless of the fact that Nebraska's Rules of Evidence are inapplicable to a dispositional hearing, the requirements of due process control a proceeding to terminate parental rights and the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. See, also, *In re Interest of C.W., M.W., K.W., and J.W.*, 239 Neb. 817, 479 N.W.2d 105 (1992); and *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

As this court commented in *In re Interest of C.W., et al., supra* at 823, 479 N.W.2d at 111:

> "[i]t is obvious that fundamental due process is difficult to define. With reference to the evidence that is to be considered in a parental rights termination case, it is further obvious that in determining whether or not fundamental due process has been afforded to all persons interested in the proceedings, the Nebraska Rules of Evidence provide a guidepost in that determination."

Fundamental fairness, at the very least, requires the adducing of appropriate evidence as a factual foundation for a rehabilitative plan which eventually may be used as a ground or condition for termination of parental rights. If a court's order for a rehabilitative plan is not supported by the record, the plan may be some pro forma judicial inscription of activity which occurred outside the open courtroom or an unsubstantiated order which necessarily would be characterized as an arbitrary act. Either situation may deny due process. *In re Interest of J.S., A.C., and C.S., supra.*

As a threshold matter, the court did hold a dispositional hearing in which the parties *stipulated* that DSS had "made reasonable efforts for the child to be in the home, or that reasonable efforts could not be made and that the child has to be out of the home because it would be in danger." Counsel for the mother stated to court verbatim, as follows:

> MR. SCHUMACHER: Your Honor, I've gone over the case plan with my client and she had previously gone over it with the members from the Department of Social

Services. And she's aware of—of what the recommendations are and what the program that's outlined in the case plan and she's aware that the visitations will increase after the first of the year at least duration wise. And she's willing to follow the recommendations or at least the schedule and the—the—the various goals and services which have been outlined in it. And we'd have—We have no objection to the case plan and—and would ask that the Court approve it.

THE COURT: She's willing to undergo the educ—or the counseling and the family assessment and the psychological evaluation?

(THE MOTHER): Yes, Your Honor.

THE COURT: And this is—Does she understand the permanency objective for (the child) is reunification with her?—See what—Do you understand that?

(THE MOTHER): Yes, I do.

THE COURT: And this is suppose [sic] to be accomplished by June of 1991?

(THE MOTHER): Yes, I do.

THE COURT: I noticed in the report that some of the visitations were not kept. Some of 'em—A couple of 'em were excused, but some of 'em weren't. Do—I would like to stress to you that because of the age of (the child), it would be important that you keep all visitations so that his bonding to you could be met. And you're agreeable to that?

(THE MOTHER): Yes.

Our review of the plan admitted into evidence at this evidential hearing revealed a rather vague set of descriptions of the goals (e.g., work on self esteem, identify how actions or inactions brought the child to the attention of the court system, identify how past experiences have affected current functioning in relation to herself, others, and the child); and the instrumentalities (e.g., individual counseling) in which those goals were to be met. While we realize that psychology and mental health are, in no way considered to be exact sciences, we do expect mental health professionals to be clear in their

explanations of the behaviors and goals they are expecting. While the court did not read a verbatim account of the rehabilitative plan into the record, he did ask the mother in plain terms to determine whether she did indeed understand the various goals she would need to accomplish in order to gain custody of her son again. The mother stated that she understood and approved of the plan. Her attorney stipulated with the State and GAL a joint acceptance of the finding of reasonable efforts and the terms of the plan and furthermore, affirmatively asked that the plan be approved.

Collateral attacks on previous proceedings are impermissible unless the attack is grounded upon the court's lack of jurisdiction over the parties or subject matter. *In re Interest of C. W., M. W., K. W., and J. W.*, 239 Neb. 817, 479 N.W.2d 105 (1992). On that basis alone, we find it unnecessary that we address that issue further.

As for the constitutionality of Neb. Rev. Stat. § 43-285(2) (Reissue 1988 & Cum. Supp. 1992), we find that due process was indeed accorded to the mother. The concern surrounding the statute (which allows the court to disapprove a plan when any party proves by a preponderance of the evidence that the plan is not in the juvenile's best interests) and its constitutionality focuses on the right of a parent to not be required to perform unreasonable tasks nor prove a negative burden—that the plan is not in the child's best interests.

While the concern is certainly a legitimate one, not to mention constitutionally grounded, nothing in the statute or constitution relieves a party of the responsibility for objection at an evidential hearing held precisely for that purpose. As we have held, the improper admission of evidence by the trial court in a parental rights termination proceeding does not, in and of itself, constitute reversible error, for, as long as an appellant properly objected at trial, this court will not consider any such evidence in its de novo review of the record. *In re C.K., L.K., and G.K.*, 240 Neb. 700, 484 N.W.2d 68 (1992); *In re Interest of C. W., M. W., K. W., and J. W., supra.*

As the mother voiced no objection to the rehabilitation plan, with the exception of the reunification date, her first two assignments of error are without merit.

In her fourth assignment of error, the mother alleges that the provisions of the case plan were not material, reasonable, and necessary to correct, eliminate, and ameliorate the situation or condition on which the adjudication had been obtained. As previously discussed, the mother did not object, properly or otherwise, that any of the provisions of the case plan were in any way unacceptable or unreasonable. This assignment is without merit.

We next address the mother's assignment that the court "impermissibly" delegated its judicial responsibility by leaving the nature and frequency of the counseling to be administered through the rehabilitative plan to the discretion of DSS. Again, the mother did not object to the counseling provision in the dispositional hearing. In any event, the assignment is, at the very least, an erroneous and misleading statement. The court must depend, to some extent, on the recommendations of DSS in determining what course of rehabilitation is appropriate or there would be no need for DSS to exist. While the name of the counselor, and the nature and frequency of the counseling could have been specified in the plan, such a mandate would not be advisable. The initial counselor selected for a client may not be well suited to the client's needs and selecting a different counselor may be appropriate. Furthermore, the nature and frequency would necessarily and should be determined by the counselor or therapist who is trained to assess the mental state and estimate what course of therapy is advisable. Tailoring the rehabilitation plan too narrowly in these circumstances can only serve to undermine the parent's progress and require needless court time to re-approve necessary changes.

We next address the mother's third, sixth, and seventh assignments which alleged court error in finding clear and convincing evidence that (a) the mother had failed to follow the court-ordered case plan to rehabilitate herself so that her son could be returned to her, and (b) that she substantially, continually, and repeatedly neglected her minor child, and furthermore, (c) that the child's interests were best served by terminating the parental rights of his mother. This Court has consistently maintained, as a common tenet of Nebraska law, that to justify termination of parental rights under the

provisions of Neb. Rev. Stat. § 43-292(2) (Reissue 1988), the State must prove by clear and convincing evidence that a parent has substantially and continuously or repeatedly neglected the child. *In re Interest of S.B.E. and D.E.*, 240 Neb. 748, 484 N.W.2d 97 (1992).

In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code, termination of parental rights is permissible when the basis for such termination is provided by clear and convincing evidence. *In re Interest of S.B.E. and D.E., supra*; *In re Interest of T.C.*, 226 Neb. 116, 409 N.W.2d 607 (1987).

Regarding parental noncompliance with a court-ordered rehabilitative plan, under Neb. Rev. Stat. § 43-292(6) (Reissue 1988), as a ground for termination of parental rights, the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child. *In re Interest of L.H.*, 227 Neb. 857, 420 N.W.2d 318 (1988).

A provision in a rehabilitative plan is material to rehabilitation of a parent if such provision tends to correct, eliminate, or ameliorate the situation or condition on which an adjudication is obtained under the Nebraska Juvenile Code. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of M.P.*, 238 Neb. 857, 472 N.W.2d 432 (1991); *In re Interest of J.S., A.C., and C.S., supra*.

Turning to the evidence gleaned from the record, we found some of the behaviors of this DSS' office less than satisfactory. When the mother was late to an appointment or if the appointment had to be cancelled due to weather, a holiday, or if the child was ill, DSS would count the appointment as a missed appointment (or a no-show). Caseworker Joy Loeschen admitted that, once the GAL filed his initial motion to

terminate parental rights in this case, her goal became focused on termination. Loeschen testified in her deposition that, even if the mother had—on her return to Nebraska in August, 1990—been consistent with visitation and the requirements of the case plan, her decision to terminate still would not have changed. DSS checked up on the mother after she had cancelled visits due to a doctor appointment and for an interview out of town and, upon learning that she did not have a doctor appointment or a job interview at that location, made no effort to ascertain whether there had been a reasonable explanation for the incongruencies. (As for the job interview, the mother did show up at the IBP facility at the time she asserted that she had 'an interview' and filled out an application.)

DSS was well aware that the mother herself had been a ward of the State up until recently, with little guidance in the way of role modeling for effective parenting skills. Her father was an alcoholic and her mother suffered from severe emotional problems and was still suffering the consequences of a suicide attempt via ingesting DRANO. It seems logical to assume that this particular mother would need more assistance in an advocative relationship with DSS than she received.

Any request of a parent in a rehabilitation plan must be reasonable and in keeping with the specific provisions of the rehabilitation plan approved by the court. If a parent does not comply with an unreasonable request of a counselor, the parent should not be penalized. *By the same token*, a parent should be made aware that it is the court, not the parent, which determines whether a recommendation by a counselor is unreasonable. See *In re D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992).

We do not see evidence that the requests by DSS were unreasonable. We do recognize that DSS was somewhat uncooperative, adversarial, and frustrating about the matter. Nevertheless the evidence was clear and convincing that the mother failed to follow the court-ordered rehabilitative plan, that she continued to neglect her son, and that her son's interests were best served by termination.

While DSS' adversarial tactics and lack of cooperativeness are not to be endorsed or condoned and we certainly

understand the mother's frustration with the matter, the evidence remains clear that she was the party ultimately responsible for her failure to correct the conditions which led to the juvenile court's intervention. Indeed the mother took a situation—which initially appeared to be an infant's neglect as a result of a mother's immaturity—and exacerbated the matter into what comes dangerously close to the legal definition of abandonment.

She asserted that the reason for her disappearing act was due to the fact that the visits were too emotional for her and that she "felt as if [DSS] was not working towards reunification . . . sometimes stated goals and underlying goals are two different things".

The mother martyred her cause when her son was not responding to her like a son should, "He had his foster parents. He had his own babysitter. He had everything he needed. I was unwanted baggage in his life at that point in time". She tended to avoid her obligations by "forgetting", not following through, and generally believing that she's doing a better job at something than she is. The mother cancelled appointments to see her son because she "had to clean her house", or was too tired. She agreed that she was intelligent with no difficulty in learning, but qualified that "I do lack a lot of common sense".

Often during visits, the mother would simply leave her son in his car seat. If he cried, she would leave him in the seat and give him a bottle. Rather than interact with her child, she would talk to the supervising caseworker about what she needed to do in order to get her son back, while he lay on the floor or sat in the car seat.

The record is replete with indications that the mother's priorities were not located with her son until termination proceedings were implemented and, effectively, it was too late.

As Dr. Huebner testified, "[I]t's very poor for a child's healthy development to have lots of changes in caregivers or instability in their caregivers" When asked how long the child could wait for his mother to mature, Dr. Huebner responded "that some evidence suggests it's already too late . . . the foundation of whole attachment relationships are basically done in the first year of life . . . [C]hildren with disrupted

attachments early in infancy and early childhood show the . . . greater degree of disturbance in relationships . . . and normal maturational functioning later in life."

The right of a parent to custody and control of his or her children is not an inalienable right. The public has a paramount interest in the protection of children from neglect. *In re L.J., M.J., and K.J.*, 238 Neb. 712, 472 N.W.2d 205 (1991).

These assignments of error are without merit.

We consider the mother's contention that the court erred in allowing a caseworker to render an opinion that the mother's rights should be terminated and that it was in the juvenile's best interest that the mother's rights be terminated. Such opinions were just that, and although not required, it was certainly within the court's discretion to ask for recommendations from "experts" on the case, in this case the case-worker, the doctor conducting the psychological evaluation, and the GAL. The court received such opinions, not as conclusive evidence which relieved the court of the ultimate responsibility for determination, but as opinions from experts—whom the court could choose to rely upon or not. That assignment is without merit.

Regarding the mother's complaint that the sustaining of the motion in limine filed by the State and GAL not only prohibited the mother from adducing testimony of Dr. Sanders, but also denied the mother due process of law, we look to the record.

While it is unclear from the record whether the mother's counsel turned over the entire case file or just a portion of it, the court concluded that the documents submitted for Dr. Sanders' review in his capacity as an expert witness included sensitive court records which were subject to the court's protection order.

A party who challenges a trial court, asserting that the court abused its discretion with regard to sanctions imposed for discovery violations, must show that the ruling of the court was clearly untenable, depriving the litigant of a substantial right and denying a just result in the matter submitted for disposition. *In re Interest of C.W., M.W., K.W., and J.W.*, 239 Neb. 817, 479 N.W.2d 105 (1992).

The protective order itself directed, "[t]hat those documents to be produced by the State of Nebraska and the Nebraska

Department of Social Services shall be regarded as confidential and shall not be used by the Defendant for any purpose whatsoever *except for use in preparing for and in trial of the above-titled matter*; . . . ." (Emphasis supplied.)

Dr. Sanders had been asked by counsel for the mother to perform a psychological evaluation on the mother. The psychologist was furnished various DSS records including police records, a psychological report of Dr. Huebner, hospital records, court orders, case plans, visitation notes, case plan reviews, correspondence, Foster Care Review Board reports and other related documents which he deemed necessary in order to adequately conduct such an evaluation. In his words: "[T]he more information that's available, the more data I have the more accurate and more complete the psychological evaluation can be. And its [sic] always necessary to have background information on the individual that I'm evaluating." Dr. Sanders' report of some seven pages is found in the record as exhibit 49 received only as an offer of proof.

In the first place, the record does not establish that any of the materials supplied to Sanders came within the purview of the protective order. However, even if the record had established such to be the case, the record fails to demonstrate that the materials were used for any purpose other than in the preparation for and the trial of this cause, just as the order permits. Accordingly, the juvenile court erroneously concluded that the mother had violated its protective order.

That brings us to Neb. Rev. Stat. § 43-2,108 (Reissue 1988), which provides that with certain exceptions not relevant here, "the medical, psychological, psychiatric, and social welfare reports and the records of juvenile probation officers as they relate to individual proceedings in the juvenile court shall not be open to inspection, without order of the court . . . but shall not be made available by such judge to the parties or their counsel." It is possible that this section formed the basis for the juvenile court's protective order.

However, statutory provisions do not overcome constitutional rights. *State ex rel. Caldwell v. Peterson*, 153 Neb. 402, 45 N.W.2d 122 (1950) (Legislature cannot lawfully act beyond limits of Constitution). Since Star Chamber

proceedings were abolished long ago, *Parker v. Roth*, 202 Neb. 850, 278 N.W.2d 106 (1979), it may be that a statute which undertakes to secrete from a party information provided to the tribunal which uses that same information in adjudicating that party's parental rights offends due process. See, also, *In re Complaint Against Staley*, 241 Neb. 152, 486 N.W.2d 886 (1992) (juvenile court is not Star Chamber where proceedings may be conducted in secrecy). However, inasmuch as this case mounts no constitutional attack on § 43-2,108, it is unnecessary to reflect further upon the constitutional concerns that statute evokes.

Having determined that the trial court erred in failing to permit the evidence tendered by the mother from Dr. Sanders, we conclude that the mother suffered no prejudice because we consider his evaluation from the offer of proof in our de novo review of the record.

Dr. Sanders found nothing remarkable about this case. Much of his information came from sources which have previously been quoted in this opinion. He found that the mother was defensive because of her previous experience with DSS. She maintained a clean, adequate home. The mother blamed some of her shortcomings on the fact that she lived with her grandmother, from ages 11 to 17, whom she described as one who condemned "everything and everybody." Dr. Sanders agreed that there was sufficient evidence of the child's poor physical condition "to take action to protect (the child), and upon his release from the hospital he was placed in a foster home by DSS." It was also recited by Dr. Sanders that the mother's visits with her son were somewhat irregular, many visits having been cancelled by the mother, some listed as "no show, no call", and that the mother was often late.

Dr. Sanders concluded his evaluation with the opinion that the mother "has the potential to become a responsible loving and nurturing parent." He then listed 11 components of a suggested "new plan" for reunification.

Having reviewed the evidence consisting of Dr. Sanders' evaluation against the testimony of Dr. Huebner and the many exhibits in this voluminous record, we conclude that his evaluation is not sufficient to overcome the conclusions which

we must and do draw from the whole record, as our later decision will demonstrate.

The court's denial of the mother's motion to strike testimony of Dr. Huebner was appropriate. Dr. Huebner testified as the court's expert witness and performed the court-ordered psychological evaluation of the mother. She presents no evidence that Dr. Huebner received confidential information in violation of the protection order or any statute, namely, § 43-2,108(4).

The mother next contends that the court abused its discretion and committed prejudicial error by admitting exhibits and testimony containing hearsay and depriving the mother of her rights to confront and cross-examine.

The mother first contests the admission of exhibit 2. The court clearly and appropriately admitted the exhibit as a business record "—for the purpose of showing what interest the Department of Social Services had in the matter. And not necessarily that—as to whether or not the facts stated in the business record are true or not true by other witnesses, but that [DSS] . . . had this information available to him [sic] and they were acting on it."

The mother generally further alleges that exhibits 5, 10, 12, and 13 all are replete with hearsay and double hearsay, but does not specify in what ways. As mentioned above, the Nebraska Rules of Evidence do not apply to juvenile proceedings, but merely provide a guidepost in the determination of fundamental due process. See *In re Interest of C.W., et al., supra.* The mother's due process rights were not violated and the assignment is without merit.

Finally, as to the mother's contention that she ought to have been allowed to adduce testimony as to whether the child's father's parental rights had been terminated, the assignment is without merit. Such evidence is in no way relevant upon the issue of whether the mother's own parental rights should be terminated. Certainly, such evidence is not only appropriate, but required at such time as the child would be placed and decreed for adoption, but not at the termination level of the proceedings.

In light of a thorough evaluation of the foregoing

assignments of error, this appears to be classic example of a mother giving birth and electing to keep a child when she is too emotionally immature to effectively handle the responsibility. We recognize that, while the initial circumstances which brought the child into the court system were not particularly alarming in light of the lack of experience an 18-year-old brings to child rearing, we would expect some common sense and initiative to be utilized by a young mother to ensure prevention of a "repeat performance." While the mother may well be an intelligent young woman with an abundance of potential, the fact remains that she has chosen a path of uncooperativeness in which she has been refusing to make anything more than an insignificant effort to utilize that potential or exhibit sufficient motivation to take the measures necessary to regain custody of her child. While we cannot condone the sloppy and adversarial manner in which this DSS office handled this matter, the blame for the failure to correct the conditions remains with the mother.

A child cannot, and should not, be suspended in foster care, or be made to await uncertain parental maturity. *In re D.A.B. and J.B.*, 240 Neb. 653, 658, 483 N.W.2d 550 (1992); *In re L.J., M.J., and K.J.*, 238 Neb. 712, 472 N.W.2d 205 (1991). As we held in *In re Interest of C.W., M.W., K.W., and J.W., supra*, "[T]he evidence supports a causal relationship between the mother's behavior and likely damage to the children, and we will not ask the children to wait and see whether their mother grows up in the future. She has not found the incentive to mature and change her lifestyle over the years this case has been progressing through the juvenile court, when that was the only obstruction to having her children returned to her." *Id.* at 831.

It is not necessary that the court await the time that the child shows permanent scars of a parent's anger and impulsivity before acting to terminate the relationship. *In re Interest of J.D.M.*, 230 Neb. 273, 430 N.W.2d 689 (1988).

At this time, the child is over 2 years of age and has been in the State's custody since he was 2 months old. He needs stability and parental figures in his life upon whom he can depend. We will not ask him to wait any longer. The best interests of the child cry for stabilization of his environment.

924

The termination of the mother's parental rights is affirmed, with a directed reminder to expeditiously, yet comporting with due process, commence proceedings to determine the rights of the biological father, so that the child's rehabilitation and stabilization will not be delayed any longer than necessary.

AFFIRMED.