IN RE INTEREST OF CONSTANCE G.,
A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. LARRY G., APPELLANT.
575 N.W. 2d 133

Filed February 27, 1998.    No. S-97-600.

Michael J. Shaughnessy, of Shaughnessy Law Office, for appellant.

Gregory G. Jensen, Howard County Attorney, for appellee.

Patrick L. Neid, guardian ad litem.

Jay B. Judds, of Lauritsen, Brownell, Brostrom, Stehlik & Thayer, for Beth S.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

This juvenile proceeding is before us for the second time. In the first appearance, we held that the county court sitting as a juvenile court had acquired jurisdiction over the subject child, Constance G., under the provisions of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993), as a juvenile who was homeless

or destitute, or without proper support through no fault of her parent, guardian, or custodian. *In re Interest of Constance G.*, 247 Neb. 629, 529 N.W.2d 534 (1995) (*Constance G. I*). The juvenile court subsequently terminated the parental rights of the father, Larry G., in and to the child on the grounds that reasonable efforts have failed to correct the conditions leading to the assertion of jurisdiction; that the father has failed to comply with the terms of the court-ordered case plan; that he has neglected or refused to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of the child; and that it is in the child's best interests that the father's parental rights be terminated. The father has appealed, asserting, in summary, that the juvenile court erred in (1) admitting certain evidence and (2) finding the evidence sufficient to support its order. We reverse, and remand with the direction that the child be reunited with the father, as more particularly set forth in part V below.

## II. SCOPE OF REVIEW

In an appeal from a judgment terminating parental rights, an appellate court tries factual questions de novo on the record, which requires it to reach a conclusion independent of the findings of the trial court, but when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *In re Interest of L.H. et al.*, 241 Neb. 232, 487 N.W.2d 279 (1992). See, also, *Constance G. I*.

## III. FACTS

Within 2 weeks of the child's birth on January 1, 1992, following an argument between the mother and father in which the police were called to their apartment, the mother took the child and moved back to her parents' home in Dannebrog, Nebraska.

Because of mental health problems, the mother was hospitalized in early March 1992 and voluntarily relinquished the child to the then Department of Social Services and present Department of Health and Human Services, 1996 Neb. Laws, L.B. 1044, which placed the child in foster care. The mother and father reunited for a few months in Lincoln, but the mother again left, this time moving to Grand Island. The nature of the

mother's mental illness is such that her reunification with the child is not a realistic possibility, and her rights are not at issue in this proceeding.

The child was originally determined to be one who failed to thrive and has been classified as a special needs child by her pediatrician. She suffers from mild cerebral palsy, is cross-eyed, and has a mild attention disorder. The pediatrician testified that she would continue to be a very high-needs child, requiring constant monitoring and very strict structure.

The petition resulting in *Constance G. I* was filed on March 11, 1992. The father was identified as having an anger control problem and as needing parenting skills. He admitted having a history involving domestic violence prior to his relationship with the mother. That included hitting his former wife on more than one occasion, hitting a live-in girl friend once, and hitting another girl friend on a number of occasions, although he described those incidents as self-defense. There were reports of domestic violence involving the father and his girl friend in November 1994 and again in April 1995. The 1994 incident resulted in an assault conviction for which the father received 6 months' probation.

A visitation caseworker testified that a child once reported that the father "almost choked" another child while disciplining him. The caseworker was present in the house when the incident occurred and did not seem to believe it was serious.

Dr. Patricia M. Sullivan, a psychologist, recommended that the child have continued contact with both natural parents, testifying that she expected the child to have problems if her bonds with the parents were broken.

Visitations with the child were scheduled with both parents. A social worker who supervised the meetings between 1992 and 1994 testified that the child generally became upset during these visits, but the social worker could not remember if the child had a more negative reaction to the father or the mother. The social worker described the father as occasionally doing things during the visitations that she characterized as "somewhat antagonistic." During 1993, the father missed numerous scheduled visitations due to work. But the visitations gradually increased in length, and the child reacted positively.

Sullivan proposed six recommended goals that the father be required to meet, suggesting a 6-month timeframe in order to give him sufficient time to show that he could accomplish the goals and so that some kind of closure could be reached. The department developed a case plan with five goals that overlapped with Sullivan's recommendations. The juvenile court adopted both Sullivan's goals and the department's case plan as goals for the father to meet in order to be considered rehabilitated so that reunification with the child could occur. The juvenile court's plan thus required the father to contribute financially to the support of the child; provide a suitable home for visitation by the child; attend a parenting class with coursework providing him an opportunity to demonstrate concepts presented therein; attend psychotherapy sessions, both individual and group, addressing violence issues; participate in a violence group composed of individuals who have physically assaulted loved ones; and attend a 12-step program such as Alcoholics Anonymous and obtain a sponsor.

The father first learned of the requirements of the case plan in a meeting in April 1996. He did not reach all of the goals in the 6-month period, which would have been by October 1996. He did complete a parenting program, in addition to the parenting programs he had earlier completed. He has also met with Dr. Jeffrey Stormberg, a psychotherapist, regularly since 1993. He attended an anger alternatives therapy group through the Nebraska Mental Health Center, but that group did not begin until November 1996. He did not begin attending Alcoholics Anonymous and get a sponsor until February 1997, less than 2 months after the motion to terminate his parental rights had been filed.

A review hearing was held on October 16, 1996, at which time it was determined that the father had only partially complied with the requirements of the case plan, and the juvenile court thereafter entered its termination order.

## IV. ANALYSIS

### 1. Admission of Evidence

The father contends that the juvenile court erred in admitting the opinion of a clinical psychologist that the father's parental

rights should be terminated and in admitting the written report containing the findings and recommendations of the State Foster Care Review Board.

## (a) Psychologist's Opinion

The psychologist, Dr. John Meidlinger, examined the father in November 1993 and the child in December. At that time, he was of the view that it was not in the child's best interests for the father to have custody. The opinion in question was expressed on March 5, 1997.

The father urges that as the psychologist's last personal contact with him was in 1993 and the last contacts with the child were in 1995, the psychologist's March 5, 1997, opinion was considerably dated. That argument, however, goes to the weight to be given the opinion, not to its admissibility. Thus, the juvenile court did not err in receiving the March 5 opinion.

## (b) Review Board's Report

Next, the father complains that the juvenile court received the hearsay report of the review board. In that regard, Neb. Rev. Stat. § 43-285(6) (Cum. Supp. 1996) provides:

> Any written findings or recommendations of the State Foster Care Review Board or any designated local foster care review board with regard to a juvenile in a foster care placement submitted to a court having jurisdiction over such juvenile shall be admissible in any proceeding concerning such juvenile if such findings or recommendations have been provided to all other parties of record.

It must be borne in mind, however, that the Constitution of this state distributes the powers of government into three separate and coequal departments, or branches, namely, the legislative, executive, and judicial branches. Moreover, the Constitution prohibits any one branch from exercising any power belonging to another branch. Neb. Const. art. II, § 1; *State ex rel. Shepherd v. Neb. Equal Opp. Comm.*, 251 Neb. 517, 557 N.W.2d 684 (1997). Thus, we have held that while the legislative branch may have the right in some contexts to prescribe that certain evidence be admissible in a court of law, it is a judicial function to determine whether the evidence is of probative value and to determine the weight, if any, to be given such evi-

dence. See, *State v. Burling*, 224 Neb. 725, 400 N.W.2d 872 (1987); *State v. Bjornsen*, 201 Neb. 709, 271 N.W.2d 839 (1978).

The decisions of the U.S. Supreme Court have made plain that a parent's desire for and right to "the companionship, care, custody, and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). In a later parental termination case, that Court noted: "If the State prevails, it will have worked a unique kind of deprivation. . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981). It observed:

> For all its consequence, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895[, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961)]. Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

452 U.S. at 24-25 (involving due process considerations for proceedings to terminate parental rights).

Shortly after *Lassiter*, the U.S. Supreme Court wrote in *Santosky v. Kramer*, 455 U.S. 745, 753- 54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982):

> In *Lassiter*, it was "not disputed that state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." [Citations omitted.] The absence of dispute reflected this Court's historical

recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment. [Citations omitted.]

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. . . . If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

The *Santosky* Court further noted at 455 U.S. at 758: " 'The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss." ' " See, also, *Stanley v. Illinois, supra* (integrity of family unit is protected by Due Process Clause of 14th Amendment). Because hearsay evidence is not subject to the test of cross-examination, it is unreliable. *In re Interest of P.D.*, 231 Neb. 608, 437 N.W.2d 156 (1989); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). For that reason, with certain exceptions not applicable here, Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 1995), renders hearsay evidence inadmissible.

Notwithstanding that the Nebraska rules of evidence do not apply in dispositional hearings held in proceedings arising under the Nebraska Juvenile Code, the requirements of due process control in determining the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993). Thus, although the rules of evidence are inapplicable, they nonetheless provide a guidepost in determining whether fundamental due process has been afforded. *Id.*

Because statutory provisions do not overcome constitutional rights, see *In re Interest of J.H., supra*, we must conclude that the provisions of § 43-285(6) do not apply to proceedings brought under the juvenile code to terminate parental rights. See, also, *State ex rel. Caldwell v. Peterson*, 153 Neb. 402, 45

N.W.2d 122 (1950) (Legislature cannot lawfully act beyond limits of Constitution). Accordingly, the district court erred in admitting the report of the review board.

However, that determination does not end our analysis, for the improper admission of evidence in a parental rights proceeding does not, in and of itself, constitute reversible error, for, as long as the appellant properly objected, we will not consider any such evidence in our de novo review of the record. *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992); *In re Interest of D.S. and T.S.*, 236 Neb. 413, 461 N.W.2d 415 (1990).

## 2. SUFFICIENCY OF EVIDENCE

The father also contends that the juvenile court erred in finding the evidence established (1) that he failed to comply with the court's reunification plan and (2) that the child's special needs, combined with his failure to comply with the plan of reunification, made it in the best interests of the child to terminate his parental rights.

It is to be recalled that the grounds for terminating parental rights must be established by clear and convincing evidence, which is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997). Neb. Rev. Stat. § 43-292 (Cum. Supp. 1996) provides that a court may terminate parental rights when such action is in the best interests of the child and one or more of the statutorily specified conditions exist. We have held that in addition to the statutory grounds, a parent's failure to make reasonable efforts to comply with a court-ordered reunification plan provides an independent reason justifying termination of parental rights. *In re Interest of J.S., A.C., and C.S., supra.* Moreover, when parents cannot rehabilitate themselves within a reasonable time, the best interests of a child require that a final disposition be made without delay. *Id.*

## (a) Reunification Plan

We review the father's efforts to comply with the juvenile court's reunification plan under the precept that when such a plan is implemented, it must be reasonable and conducted under

the direction of the court before failure to comply with the plan can be an independent reason for termination. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

As noted earlier in part III, the reunification plan sets six goals for the father to meet. First, the plan required the father to contribute financially to the child's support and demonstrate his willingness to invest money in assisting the State in supporting the child. In this regard, the State relies heavily on the father's failure to pay part of Sullivan's bill for her evaluation. However, Sullivan's testimony indicates that the father was negotiating with her for the father to pay the portion of the bill not paid by the State, but that the State paid the entire bill. A caseworker testified that the amount of child support the father was expected to pay was never discussed with the father. The father has made a significant investment in his relationship with the child by traveling to Grand Island on a consistent basis for visitation. He also testified that he had provided health insurance through his job for the child before she was born and that he is currently carrying medical coverage for her.

The plan next required that the father maintain sufficient income to provide security and maintain adequate living quarters. The father has a general equivalency diploma and a diploma from a school of commerce. While he has made several job changes since the child was born, he has always been able to find employment. His ability to maintain an income and adequate living quarters in which to rear a child has not been raised as a concern.

Additionally, the father was to attend a parenting class of a type which would provide him with the opportunity to demonstrate his parenting ability. The father contacted one group for parenting classes but received notification on August 14, 1996, that he would not be accepted. In September, he received information about another parenting class but could not enroll because it conflicted with his work schedule. He later enrolled in a parenting class provided by a third group and completed it. He had earlier completed a separate parenting class.

The father was also required to continue individual, family, and group therapy. He began to do so in May 1993 and continued doing so on almost a weekly basis through the date of the

termination hearing, with a single 2-month break. The sessions included the child and the father's girl friend and directed specific attention to anger management.

In addition, the father was required to participate in a violence management group composed of people who had physically assaulted their loved ones. He received information on November 4, 1996, about an anger group and has been attending that class regularly since November 20. While that group does not consist entirely of those who have physically assaulted loved ones, it does include such people.

Finally, the plan required that the father attend a 12-step alcohol dependency program and obtain a sponsor. The father has attended such a program since the middle of February 1997 and has a sponsor. He testified that he did not receive from the department a list of groups until November 4, 1996.

Sullivan thought the father presented an alcohol dependency problem, but stated that the main reason for requiring attendance at alcohol dependency meetings was to help him resolve some of the issues he had with his own father so as to provide him with a good father-type role model. A certified alcohol and drug counselor testified that he evaluated the father and found that he does not have a chemical dependency problem.

The department argues that the father failed to complete three of the requirements contained in the juvenile court's reunification plan, that is, (1) failed to provide financial support for the child, (2) failed to attend a 12-step alcohol dependency program and obtain a sponsor, and (3) failed to attend group therapy dealing with violence issues. But a close examination of the record does not support these claims by clear and convincing evidence.

As the juvenile court observed with regard to the financial support claim, the father is "a hardworking person of limited income, who has expended substantial time and money on various problems to meet the goals required by the Court. Those expenses can be considered expenses for the child."

It is true that the father was clearly tardy in beginning to participate in a 12-step alcohol dependency program and in obtaining a sponsor. But the failure to follow a court-ordered reunification plan cannot result in termination of parental rights unless the terms of the plan are material to the situation and the basis

of the adjudication. Materiality regarding such a plan exists when a parent's noncompliance results in a continued condition which was the basis for the adjudication and which is deleterious to a child expected to benefit from parental compliance with the plan. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). As noted therein, it seems somewhat draconian to dictate that a parent attend an alcohol dependency program when the parent has no alcohol-related problem. While the father does have a driving under the influence arrest, there was no testimony that drinking either caused or exacerbated his anger control problem. Given the lack of materiality of the attendance at an alcohol dependency program, it is unjust to rely upon it as a basis for termination.

That brings us to the therapy dealing with the father's history of violence. Here again, the question is not whether the father fulfilled the requirement but whether he did so in time. In any event, the father's problem with controlling his anger is one of the more serious considerations in determining his fitness as a parent. His history includes several incidents of domestic violence, beginning with his reports that his upbringing involved parents who yelled and hit each other. In order to evaluate his propensity for violence and to put it into perspective, it is useful to review the evidence in that regard.

In 1994, the father was convicted of assault against his live-in girl friend. His version of that incident is that they were roughhousing in bed and that he was tickling her when she became hysterical because she had a flashback to when she was raped at age 14. He testified that as he went to roll off of her, he accidentally caught her nose with his knee, causing her nose to bleed. He was charged and convicted of assault and was put on probation for this incident.

In addition to that incident, a social worker received a report of domestic abuse in April 1995 concerning the father and the girl friend. The report came from either a therapist for the girl friend or her children's therapist, and the incident was apparently serious enough to make an impression on the children, although the father described it as a "playful kick in the butt."

There was some testimony from a family support worker about the father's almost choking a child while disciplining

him. However, the support worker was present in the home when this incident occurred, and the clear impression from her testimony is that she did not perceive this as being a serious incident. The father's own testimony would indicate that he was acting appropriately in disciplining the child.

Stormberg testified that he did not believe the father had a pattern of anger management problems. He acknowledged isolated instances in which the father handled situations poorly, but concluded that he did not consistently or commonly react in such a fashion.

While the initial determination that foster care was appropriate was as a result of the child's negative reaction when in the presence of her parents, any conclusion that this was based upon abuse or anger by the father during the very brief time that she was in his care immediately following her birth seems, according to Meidlinger, quite unlikely.

There is no question that the father has exhibited a history of domestic violence, but there is no proof that any violence was ever directed toward the children or the mentally handicapped adults who have been in his care, other than the choking incident about which the only witness to testify, other than the father, said, "I'm not saying that he did anything . . . ."

Neither is there any evidence of any episodes of anger leading to violence in the period after the case plan was formulated. Nor is there any evidence that he failed in his attempts through therapy to control his problem. Indeed, if the sketchy evidence concerning the father's history of violence were sufficient to justify the termination of parental rights, then it was justified in April 1996, and the charade of investing the department's resources in an attempt at family reunification should have been avoided.

Since the evidence does not clearly and convincingly establish that the father failed to comply with the court's reunification plan, his conduct in that regard does not justify the termination of his parental rights.

### (b) Best Interests

The father next claims that the juvenile court erred in finding that it was in the child's best interests that his parental rights be terminated.

There are indications that the child has a short attention span, is nervous, and "is going to need constant monitoring . . . to be watched very closely . . . to have a very, very strict, structured time" as to "when she eats, what she eats, when she goes to bed." Among other things, the child worries and screams excessively, has extreme mood swings, is disobedient, is cruel to animals, does not get along with children her own age, physically attacks people, and is excessively loud. At the time of Sullivan's report, the child was still wetting herself during the day even though she was almost 4 years old. All of this indicates that she is a child needing special attention.

However, that circumstance in and of itself does not provide a basis for terminating the father's parental rights, as the record does not clearly and convincingly establish that he is not capable of providing that special attention. See § 43-292(2). The evidence is that he has learned and can demonstrate some sound parenting techniques, that he has had considerable vocational experience working with people with special needs, and that he has lived in a household with at least one child exhibiting some special needs.

A family support worker who supervised the father's visits with the child was complimentary.

> The visits are good. [The father] does a good job parenting, demonstrating the parenting skills. He's patient. He allows for time to transition from the foster family to him. . . . He does not push her to do things that she's not ready to do. He encourages her, uses a lot of praise. Challenges her a little bit at times, very aware of safety, and lets you know how much he cares.

The father's therapist testified that "[the father's] knowledge of parenting has revealed a fairly well-informed parent of the physical, developmental, child care, and relationship needs of children. [He] has read *Dr. Spock's Baby and Child Care* and Penelope Leach's *Your Baby and Child,* and subscribes to *Parenting Magazine.*"

The father's work history includes working at the Beatrice Community Hospital, working with developmentally disabled residents at the Beatrice State Developmental Center from 1978 through 1989, and working as a residential aide at the Lincoln

Office on Mental Retardation. A past coworker testified that during 2 years of working with the father providing care to people who were mentally retarded, the coworker had never seen him become violent, nor was he ever worried about the safety of those in his care.

When the father lived with one of his girl friends, he also served as a surrogate father to the two of her children who lived with them, one of whom was hyperactive. According to the father's therapist, the father "spent a good deal of time on a daily basis not just assisting [the girl friend] in managing the kids, but he was often in charge while [the girl friend] was gone. . . . He was continually challenged with these two kids in the home."

There is no indication that the child will have any more trouble developing in the custody of the father than she would have in the custody of the foster parents. The evidence is that the father has benefited from the therapy that he has received and the parenting classes he has attended. On the record presented, we must conclude that the father has substantially complied with the juvenile court's reunification plan and has substantially rehabilitated himself. We therefore find that the best interests of the child are not served by terminating the father's parental rights but, quite to the contrary, are best served by reestablishing his parental role.

## V. JUDGMENT

For the foregoing reasons, the order of the juvenile court terminating the father's parental rights is reversed and the cause is remanded with the directions that the rights of the father to the child be reinstated and that physical custody of the child be restored to him, subject to supervision by the department for such reasonable period of time as the juvenile court deems appropriate.

REVERSED AND REMANDED WITH DIRECTIONS.