IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ISAIAH S. & NOAH F.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ISAIAH S. AND NOAH F., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MICHAEL F., APPELLANT.

Filed December 6, 2016.    No. A-16-254.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER KELLY, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and John J. Jedlicka for appellant.

Donald W. Kleine, Douglas County Attorney, and Jennifer C. Clark for appellee.

INBODY, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Michael F. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his two sons, Isaiah S. and Noah F. We affirm.

BACKGROUND

*Procedural Background.*

Michael is the father of Isaiah, born in 2006, and Noah, born in 2009. Jennifer S. is the biological mother of Isaiah and Noah; she is also the mother of Austin S., but Michael is not Austin's father. The State filed a motion to terminate Jennifer's parental rights to her children, but that motion was still pending at the time the juvenile court terminated Michael's parental rights. Because Jennifer and Austin are not part of this appeal, they will only be discussed as necessary.

Due to domestic violence, drug use, and homelessness, the boys were removed from parental care and custody in June 2014, and placed in the custody of the Nebraska Department of Health and Human Services (DHHS); they were placed in foster care where they have remained.

In June 2014, the State filed a petition alleging that Isaiah and Noah were children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013) due to the faults or habits of Michael. The State alleged that (1) Michael and Jennifer engaged in domestic violence in the presence of the children; (2) Michael's use of alcohol and/or controlled substances placed the children at risk of harm; (3) Michael failed to provide the children with proper parental care, support, and supervision; (4) Michael failed to provide the children with safe, stable housing; and (5) due to the above allegations, the children were at risk of harm.

In September 2014, after a hearing on the matter, the juvenile court found that the allegations in the petition were true by a preponderance of the evidence and adjudicated Isaiah and Noah to be within the meaning of § 43-247(3)(a) due to the faults of habits of Michael. The boys were ordered to remain in the care and custody of DHHS for appropriate care and placement. Michael was ordered to undergo psychological and chemical dependency evaluations.

On September 26, 2014, Michael was arrested in Dodge County, Nebraska, and jailed in the Saunders County jail.

After the disposition hearing in November 2014, the juvenile court ordered that the children remain in the custody of DHHS, and that Michael undergo psychological and chemical dependency evaluations. Michael was allowed to have "written-letter-only communication with the minor children to be screened," and as arranged by DHHS and Nebraska Families Collaborative (NFC).

After a "dispositional evaluation check" hearing in January 2015, the juvenile court ordered Michael to participate in a residential dual-diagnosis therapy program "if and when logistically possible, given [his] ongoing incarceration." Michael was also allowed to start having "two 10 minute phone calls (no video)" per month with his children, to be supervised by the children's therapist.

In March 2015, Michael filed a motion to allow supervised visitation with his children at the Salvation Army, where he had begun treatment. The juvenile court sustained Michael's motion and ordered that he be allowed reasonable rights of therapeutic visitation at the Salvation Army as recommended by the children's therapist.

After a review and permanency planning hearing in May 2015, the juvenile court ordered that any ongoing contact between Michael and the children would be determined and supervised by the children's therapist, and as arranged by DHHS/NFC. After a subsequent review and permanency planning hearing in September, the juvenile court ordered that Michael's contact with the children would be "therapeutic only in nature," as arranged by DHHS/NFC.

In October 2015, the State filed a "Third Motion for Termination of Parental Rights," seeking to terminate Michael's parental rights to Noah pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2014). The State alleged that: Michael substantially and continuously or repeatedly neglected and refused to give Noah, or a sibling, necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication; Noah had been in out-of-home placement for 15 or more of the most recent 22 months; and termination was in the child's best interest.

In January 2016, the State filed an "Amended Third Motion for Termination of Parental Rights," seeking to terminate Michael's parental rights to Isaiah and Noah pursuant to § 43-292(2), (6), and (7). The State's allegations were the same as in the October 2015 motion, but were amended to also include Isaiah.

*Termination Hearing.*

The hearing on the motion for termination of Michael's parental rights to Isaiah and Noah was held February 26, 2016. The State called only one witness, Cindy Johnson, the family permanency specialist assigned to this case. Michael testified in his own behalf, and also called Heather McCue, the children's therapist, to testify. A summary of the evidence follows.

Johnson was assigned as the family permanency specialist for this family in June 2014, and was still assigned to the case at the time of the termination hearing. She was the first and only family permanency specialist on this case. However, this family was involved in a previous juvenile case with a different caseworker which was opened in March 2012 and closed in December 2013. Regarding the current case, Johnson said that Isaiah and Noah were removed from the home in June 2014 because of "domestic violence, drug use, and homelessness."

Johnson met with Michael in July 2014 and gave him her contact information. At that meeting, Johnson worked on establishing a rapport with Michael to get to know him and understand what his needs were at that time and what she could do to help. Michael was living with friends and looking for employment. He wanted to start visitation, but was not willing to work on any other services. Johnson set up a referral for weekly supervised visitation. He attended one supervised visit in July, but the visitation company discharged Michael in August after he failed to call and confirm future visits. Johnson had phone contact with Michael sometime in August, and told him that he would have to work with her to set up visits. Michael told her he was "'struggling'" and would get back to her, but Johnson did not hear from Michael again and could not reach him at the phone number he provided. (Michael did not appear at the September 2014 adjudication hearing, after which he was ordered to undergo psychological and chemical dependency evaluations.)

Johnson's next contact with Michael was in October 2014 at the Wahoo jail in Saunders County, Nebraska (she discovered his location via an internet search). She met with him to find out why he was there and what services were available in the jail; she could not recall if Michael provided her with a reason for being in jail. Johnson spoke to a lieutenant at the jail who told her there was a therapist/medication management provider who came to the jail frequently to provide support to the inmates. Johnson talked to Michael about the therapist at the Wahoo jail, but he was not interested in the service. Johnson was able to refer Capstone Behavioral Health to go to the jail to perform the court-ordered psychological and chemical dependency evaluations since the jail did not provide such services. Those evaluations were completed in December. The Wahoo jail had visitation restrictions, but did allow phone calls. According to her court report received into evidence as exhibit 36, Isaiah and Noah were able to have two 10-minute phone calls with Michael in February 2015. It was Johnson's understanding that those visits went well. However, the visits were "short-lived" because Michael had behavior issues and the jail ended his phone visits. (Although Johnson did not have a specific date for when the visits ended, we presume the visits ended in February because, as discussed next, that was when Michael was furloughed.)

On February 12, 2015, Michael was furloughed to the Salvation Army treatment facility in Omaha, Nebraska. The chemical dependency evaluation recommended treatment, and the Salvation Army was the treatment facility that accepted Michael and other inmates. According to Johnson, because Michael was incarcerated, NFC could not provide him external services. It was the criminal court that gave Michael permission to go to the program, and Michael said that the treatment was also part of his criminal requirements. Michael was at the Salvation Army program for six weeks, and Johnson had two or three phone conversations with him during that time. According to Johnson's report, exhibit 36, Michael earned an overnight pass permitting him to stay at his mother's apartment on March 27. Michael was also able to have one supervised visit with the children on March 29. After Michael had been in the Salvation Army program for six weeks, the Dodge County Attorney informed Johnson that Michael was no longer at the Salvation Army and had been returned to the Wahoo jail. Michael was not able to complete the treatment program before leaving the Salvation Army.

Johnson testified that Michael was returned to the Wahoo jail because he violated the conditions of his furlough. Johnson learned from Jennifer that Michael had come to her house and threw rocks at the windows; one of the windows broke and a rock struck Jennifer's father in the face. Jennifer told Johnson she filed a police report regarding the domestic violence incident. When Johnson spoke to Michael about the incident, Michael denied that it happened and he was "very, very distraught" about returning to jail. Michael did not know what would happen and told Johnson he would have to appear before the criminal court judge.

In May 2015, Michael was moved to the Diagnostic and Evaluation Center (D&E Center) in Lincoln, Nebraska, and then moved to the State Penitentiary. Johnson testified that it is the Penitentiary's policy that NFC cannot provide services to inmates. The only thing NFC could offer was relinquishment counseling and therapeutic phone visits with the children. The Penitentiary offers substance abuse treatment, but Johnson had no control over whether Michael was admitted into the programs. Johnson visited Michael monthly and he told her that he was on the waitlist for treatment and thought he would be able to start at the "end of this week"; she had not been able to confirm that with the Penitentiary.

Based on her own work with the family, collateral information, and the amount of time the children had been in foster care, Johnson believed that terminating Michael's parental rights was in Isaiah and Noah's best interests. This was her opinion despite the fact that visits had gone well. She stated that the reasons the children were in foster care had not been addressed. The children also needed safety, structure, and a sense of well-being; they needed to be able to move on emotionally. Michael's release date from prison is uncertain, and it is unknown when he will be rehabilitated.

McCue is a licensed independent mental health practitioner and had been working with Isaiah and Noah since October 5, 2014. (We note that Isaiah would have been 8 years old at that time; Noah would have just turned 5.) She testified that she saw the boys weekly and worked with them on transitioning from various foster care situations and understanding the reason they were in foster care. She also worked with them on behavioral adjustments, "which would be . . . anger, crying, sulking, becoming silent."

McCue diagnosed Isaiah with depression and anxiety. He was the middle child (between Austin and Noah) and had taken on a lot of the emotional responsibility for the family; he worried

a lot. Isaiah does not have the same anxieties with Michael as he does with his mother because Michael talked about general things (e.g. what he had for breakfast or books he was reading) whereas Jennifer talked to Isaiah about her illnesses. It is important for Isaiah to have a caregiver who is able to help him through his anxiety, to be there and to be able to implement coping strategies. Isaiah had made progress, and McCue attributed that progress to consistent parenting, stability, and not moving from place to place. If Isaiah did not have stability or consistency with his caregiver, McCue would be concerned about a lack of adjustment and not being at the appropriate developmental age (either being immature or more mature).

Noah's diagnosis was adjustment disorder with anxiety. He was disruptive to his environment because he was always on the go. Noah needs structure, predictability, consistency, and stability over time, and the absence of those things could lead to conduct issues. McCue said that Noah is doing well and has a lot of potential.

When McCue first started working with the boys, they did not have contact with Michael because his whereabouts were unknown. Once Michael was located, McCue supervised all contacts between him and his children from the beginning of 2015 until the termination hearing; she could not recall how many contacts there had been. All visits were positive and she observed and heard nothing inappropriate. Other than one face-to-face visit in early 2015 while Michael was at the Salvation Army, all visits between Michael and the boys were phone visits. McCue could not remember how many phone visits there were, but thought they began in the beginning of 2015 while Michael was at the Wahoo jail prior to going to the Salvation Army. The phone visits resumed when Michael was incarcerated at the D&E Center and/or Penitentiary. When Michael went to the Penitentiary in late spring 2015, phone visits occurred every other week, or twice a month; Michael missed only two visits (he testified that he did not have enough money to make the calls). Phone visits were still occurring at the time of the termination hearing.

According to McCue, when Isaiah and Noah first began having phone visits with Michael they were enthusiastic. As time went on, the enthusiasm leveled off because it was "kind of a routine." During the face-to-face visit at the Salvation Army, the boys were very happy and excited to see Michael, and they had a good time. Now that they had returned to phone visits, the boys still enjoyed visiting with Michael and wanted contact with him.

McCue did not have enough background on Michael and the boys to know what kind of bond was formed between them. However, she said it was important for Isaiah and Noah to have continued phone contact with Michael because "he is their father, and I think that they can learn from him and can benefit from that contact." Michael has been helpful regarding the boys' depression, anxiety, and behavior issues, and has continued to help them work in a positive direction. When asked if it "would be more important at this point for Isaiah and Noah to have continued contact in some form with Michael than to have no contact," McCue said "Yes."

Michael briefly testified at the hearing, and his January 2016 deposition testimony was received into evidence as exhibit 73. We summarize his hearing and deposition testimony collectively. During the summer of 2014, Isaiah and Noah lived with Michael until June. Michael was behind on his rent, the water was shut off, and he was about to be evicted. He and Jennifer argued, and Michael threw a can of beer, breaking a window in the house. Michael "placed" the children in the home of his brother and sister-in-law; after a week, the sheriff removed the children from Michael's brother's house and "took them into CPS custody." About that same time, Michael

was evicted, lost his job and his truck, and he was "homeless at the moment." He also relapsed on methamphetamines.

Michael was arrested "on a flight to avoid arrest, a theft, possession of meth, and habitual criminal charges" in Dodge County and was incarcerated in the Saunders County jail on September 26, 2014 (because there were problems with the Dodge County jail). Michael's mother tried to contact DHHS to let them know where he was. Johnson came to see Michael in October. She did not offer him any services, and told him to check into the services that the facility offered. Michael looked into speaking with the counselor there, but the counselor was only interested in trying to figure out whether or not Michael was suicidal. Capstone Behavioral Services did come to the facility to do the mental health and chemical dependency evaluations. The recommendation from the chemical dependency evaluation was intensive residential treatment for amphetamine use and addiction to alcohol. The Saunders County jail did not have a drug treatment program; they only offered a narcotics anonymous class once each month, which Michael attended.

Michael applied to several residential drug treatment facilities, and was accepted into the Salvation Army Program. The Dodge County Court granted Michael a furlough to attend the program, which he began on February 12, 2015. Michael said there were no professional counselors at the program, and that is was basically "work therapy" during the day and then AA, NA, or peer groups in the evening; there were also weekly meetings with a chaplain. According to Michael, he was removed from the program on March 31 because he was "venting" to another program participant and an employee perceived Michael's comments as a threat to staff. Michael was told that he could start the program again, and that he would just be placed on a 30-day restriction; staff told him to check back in after his April 1 probation meeting. On April 1, Michael met with his probation officer and was arrested for not being in the Salvation Army Program (according to Michael, someone neglected to tell the probation office that he was supposed to go back to the program after the meeting). Michael was returned to the Saunders County jail and remained there until May 7.

In May 2015, Michael was sentenced to prison for 5 years 8 months to 10 years for his "flight to avoid arrest, a theft, possession of meth, and habitual criminal charges" and was sent to the Diagnostic and Evaluation Center in Lincoln, Nebraska, and was later moved to the State Penitentiary. He is eligible for parole on December 13, 2016, and has a mandatory discharge date of February 13, 2019. Michael is on the waiting list for drug treatment at the Penitentiary. He would like to be considered for placement of his children after his release.

*Juvenile Court's Decision.*

In an order filed on February 29, 2016, the juvenile court terminated Michael's parental rights to Isaiah and Noah pursuant to § 43-292(2), (6), and (7), and found that termination was in the children's best interests. Michael has timely appealed the juvenile court's order.

ASSIGNMENTS OF ERROR

Michael assigns, restated, that the juvenile court erred in: (1) admitting into evidence certain exhibits and testimony over counsel's objections that the evidence violated the confrontation clause; (2) finding grounds exist to terminate his parental rights under § 43-292(2) and (6); and (3) finding it was in the children's best interests to terminate his parental rights.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

*Admission of Certain Testimony and Exhibits.*

Michael argues that "the juvenile court erred in admitting the exhibits of the case plan, court report, and affidavit of removal into evidence as well as Cindy Johnson's testimony of alleged domestic violence, over counsel's objections based on the confrontation clause." Brief for appellant at 16. Citing to *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987), Michael asserts that "[w]ithout the test of cross-examination, a hearsay report is unreliable evidence." Brief for appellant at 17.

The Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id.* In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost. *Id.*

Further, because this is a juvenile proceeding and not a criminal case, the heightened standards of the Confrontation Clause are not applicable. *In re Interest of Brian B. et al.*, 268 Neb. 870, 689 N.W.2d 184 (2004). Instead, the proper analysis is whether Michael's due process rights were violated. See *id.* The concept of due process embodies the notion of fundamental fairness and defies precise definition. *Id.* In deciding due process requirements in a particular case, we must weigh the interest of the parent, the interest of the State, and the risk of erroneous decision given the procedures in use. *Id.* Due process is flexible and calls for such procedural protections as the particular situation demands. *Id.*

At the termination hearing, Michael objected to the admission into evidence of exhibits 2, 14, 19, 36, and 42, which were various case plans and court reports authored by Johnson between August 2014 and September 2015. Those case plans and court reports included references to previous intakes and a juvenile court case for this family, all of which occurred prior to Johnson's assignment to this case in June 2014; Johnson had familiarized herself with the family's history by reviewing N-FOCUS and speaking to the supervisor involved in the previous juvenile court case. Michael's objection to the admission of the above exhibits was "for the purpose of that history of previous service interventions prior to this petition being filed [on June 20, 2014] as with respect that I don't have any ability to confront or cross-examine that part of the report as it deals with this case"; he asked that only those specific points be excluded from evidence. The juvenile court overruled his objection and received the exhibits in their entirety.

Michael also objected to the admission of exhibit 74, the certified copies of the petitions, motions, and orders filed in the juvenile case. His specific objection was to pages 7 and 8 of the exhibit, which was the June 2014 affidavit for removal; his objection was based on hearsay and "due process of confrontation and cross-examination."

Finally, Michael objected to Johnson's testimony regarding domestic violence charges from March 2015, because such testimony was based on information she received from the juveniles' mother. Again, his objection was overruled.

The only case cited in Michael's brief regarding the improper admission of evidence was *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). In that case, a "Social Services written report" was originally received into evidence at an adjudication hearing and offered again by the State at the termination hearing. That report pertained to an 11-year period and documented departmental contacts with the mother through unidentified personnel of Social Services during that period, including the mother's noncompliance with a plan departmentally dictated by Social Services before the adjudication. The mother objected to the report based on hearsay. Although the report was not admitted into evidence at the termination hearing, it was nevertheless considered by the juvenile court when the court terminated the mother's parental rights under § 43-292(6) (failure to correct conditions which led to the adjudication). On appeal, the Nebraska Supreme Court found that the report was offered to prove the truth of the matters asserted in the reports, namely, a factual basis for the conclusion that the mother had willfully failed to comply with the rehabilitative plan, and therefore the report constituted hearsay. The court further found that

> under the circumstances, the hearsay report effectively eliminated [the mother's] right to cross-examination regarding the contents of the departmental written report, which included prejudicial information embodied in entries by unidentified persons and which covered events outside the personal knowledge of any witness at the termination hearing. . . . Without the test of cross-examination, the hearsay report was unreliable evidence for termination of parental rights.

*In re Interest of J.S., A.C., and C.S.,* 227 Neb. at 265-66, 417 N.W.2d at 157.

The State argues that in the instant case, Johnson, the author of the court reports, laid the foundation for the admission of the reports, testified on behalf of the State, and was subject to cross-examination. The State further argues that Johnson laid the appropriate foundation for the admission of the reports pursuant to the hearsay exception for business records found in Neb. Rev. Stat. § 27-803(5) (Cum. Supp. 2014). See *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999). We agree with the State that, like in *Kassara*, the reports were admissible over Michael's hearsay/confrontation clause objection. Johnson laid foundation for the admission of the reports, testified, and was subject to cross-examination. She also laid the appropriate foundation for the admission of the reports under the business records exception to hearsay. And "taken together, these circumstances, provide sufficient guaranties of trustworthiness to make consideration of the reports fundamentally fair." *In re Interest of Kassara M.*, 258 Neb. at 95, 601 N.W.2d at 923. Although references to referrals which occurred prior to the adjudication which led to the instant case would generally be considered irrelevant, see *In re Interest of Kassara M., supra*, Michael did not make a relevancy objection at the termination hearing; but even if he had, any improper admission of the evidence would not have been prejudicial because, as stated below, we find that there was sufficient evidence to terminate Michael's parental rights even without considering the challenged evidence.

With respect to the affidavit for removal (authored by Gloria LaCrosse) dated June 20, 2014, that was attached to the ex parte motion for temporary custody, the State asserts that Michael's counsel did not object to the affidavit at the protective custody/detention hearing on July 18, 2014. (We note that the proceedings of the July 18 hearing do not appear in our record. And while the order from that hearing notes that "Exhibit No. 1" was offered and received into evidence without objection, there is no indication in our record as to what that exhibit was.) The State further asserts that the affidavit was admissible under Neb. Rev. Stat. § 27-902(4) (Reissue 2008), which allows for self-authentication of official entries or reports.

The State did not specifically address the admissibility of Johnson's hearsay testimony regarding domestic violence charges from March 2015.

A determination of whether or not the challenged evidence (affidavit for removal and Johnson's testimony regarding the domestic violence charges from March 2015) is admissible is not necessary to our analysis because, upon our de novo review, we find that there was sufficient evidence to terminate Michael's parental rights even without considering the challenged evidence. See *In re Interest of Jackson E.*, 293 Neb. 84, 875 N.W.2d 863 (2016) (an appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.) See, also, *In re Interest of J.S., A.C., and C.S.*, 227 Neb. at 266, 417 N.W.2d at 157 ("In an appeal from a judgment or order terminating parental rights, [an appellate court], in a trial de novo on the record and disregarding impermissible or improper evidence, determines whether there is clear and convincing evidence to justify termination of parental rights under the Nebraska Juvenile Code."); *In re Interest of Kelley D. & Heather D.*, 256 Neb. 465, 590 N.W.2d 392 (1999) (Nebraska Supreme Court assumed affidavits were inadmissible and violated father's right to confrontation, but reviewed other evidence de novo on the record and found it sufficient to support juvenile court's order of adjudication). We now set forth our de novo review of the trial record, without considering the challenged evidence, and our determination that there is clear and convincing evidence to terminate Michael's parental rights.

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Michael's parental rights to Isaiah and Noah, the juvenile court found that Michael substantially and continuously or repeatedly neglected and refused to give the children, or a sibling, necessary care and protection (§ 43-292(2)); having determined that the children were juveniles as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the determination (§ 43-292(6)); and the children had been in out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

Isaiah and Noah have been in an out-of-home placement continuously since June 20, 2014. At the time the amended third motion to terminate parental rights was filed on January 6, 2016, the children had been in an out-of-home placement for 18½ months. At the time of the termination hearing on February 26, Isaiah and Noah had been in an out-of-home placement for 20 months.

Our de novo review of the record clearly and convincingly shows that grounds for termination of Michael's parental rights under § 43-292(7) were proven by sufficient evidence.

We need not consider whether termination of Michael's parental rights was proper pursuant to § 43-292(2) or (6) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S.*, *supra*. Thus, the next inquiry is whether termination is in the children's best interests.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M., supra.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Johnson testified that Isaiah and Noah have been in foster care since June 2014. When Johnson first met Michael in July, he wanted to start visitation, but was not willing to work on any other services. After Johnson set up a referral for weekly supervised visitation, Michael attended one visit in July and was subsequently discharged by the visitation company in August. When Johnson called Michael to reestablish visitation, he told her he was "'struggling'" and would get back to her, but never did. Following the adjudication hearing in September 2014, which Michael did not attend, Johnson eventually located Michael at the Wahoo jail in October; he had been arrested on September 26 "on a flight to avoid arrest, a theft, possession of meth, and habitual criminal charges." When Johnson visited Michael at the jail, she talked to him about the therapist at the Wahoo jail, but he was not interested in the service. Johnson was able to refer Capstone Behavioral Health to go to the jail to perform the court-ordered psychological and chemical dependency evaluations since the jail did not provide such services; Michael did complete these evaluations. Because Michael was incarcerated, Johnson was unable to provide any other services to Michael, except for visitation.

Over the course of 9 months, from the June 2014 removal to March 2015, Michael only had two supervised face-to-face visits and two supervised phone visits with his children. Michael had one supervised face-to-face visit with his children in July 2014, but the visitation company

discharged Michael in August after he failed to call and confirm future visits. While Michael was incarcerated at the Wahoo jail, he had two 10-minute phone visits with his children in February 2015, but then the jail ended the phone visits because of Michael's behavior issues. Michael was able to have one more supervised face-to-face visit his children on March 29, while he was on furlough to the Salvation Army treatment program. Subsequently, from the time he was incarcerated at the D&E Center and/or the Penitentiary in May 2015 until the termination hearing in February 2016, Michael and his children had two 10-minute phone visits per month.

It is undisputed that Michael's visits with the children were positive. McCue testified that Isaiah and Noah were very happy and excited to see Michael for the face-to-face visit at the Salvation Army, and once they returned to phone visits the boys still enjoyed visiting with Michael and wanted contact with him. McCue felt that Michael was helpful regarding the boys' depression, anxiety, and behavior issues. She believed it was important for the boys to have continued contact with their father. Despite the fact that visits went well, Johnson believed that terminating Michael's parental rights was in Isaiah and Noah's best interests. She stated the boys need safety, structure, and a sense of well-being; they need to be able to move on emotionally. Even McCue testified that the boys need consistency and stability. Unfortunately, Michael has been unable to provide that for his children. Michael was unable to maintain supervised visits with his children preceding his incarceration; he was discharged by the visitation company after one visit and when Johnson attempted to reestablish visitation, Michael said he was "'struggling'" and never got back to her. Michael was further unable to maintain phone contact at the Wahoo jail because of behavior issues, and he was limited to one face-to-face visit with his children while on furlough for treatment; according to Michael, he was removed from the treatment program because an employee perceived Michael's "venting" as a threat to staff. So although Michael has had positive visits with his children, those opportunities have been limited by his own behaviors. Michael has not demonstrated a commitment to providing the consistency and stability his children need.

At the time of the termination hearing, Michael was serving a prison sentence of 5 years 8 months to 10 years. He is eligible for parole in December 2016, but his mandatory discharge date is not until February 2019. Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). And we have noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id*. Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id.*

Isaiah and Noah have been in foster care since June 2014. Michael's release date from prison is uncertain, and due to his incarceration he is unable to perform his parental obligations. Furthermore, it is unknown when Michael will be rehabilitated, as Johnson testified that the reasons the children are in foster care have not been addressed. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). We find that the State has rebutted the presumption of parental fitness. Further, without considering the challenged evidence, we find that there is clear and convincing evidence that it is in the best interests of Isaiah and Noah that Michael's parental rights be terminated.

We note that while the best interests of the children does require the termination of Michael's parental rights, such termination does not necessarily preclude continued contact between Michael and his children. See *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 718, 684 N.W.2d 594, 603 (2004) ("juvenile court retains continuing jurisdiction to enter orders, following the termination of a parent's parental rights, that are consistent with the best interests of the children, which orders may include providing for continued contact with a natural parent").

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Michael's parental rights to Isaiah and Noah.

AFFIRMED.